Argued and submitted September 7, reversed October 17, 2007

In the Matter of the Marriage of

Patrick S. CONNELLY,
aka Patrick Shawn Connelly,
*Petitioner-Respondent,*

*and*

Stacey K. CONNELLY,
aka Stacey K. Hillenbrand,
aka Stacey Kay Ladd,
*Respondent-Appellant.*

Multnomah County Circuit Court
940868011; A133109

169 P3d 1279

Margaret H. Leek Leiberan argued the cause for appellant. With her on the opening brief was Mason & Associates. With her on the reply brief was Jensen & Leiberan.

Jacqueline L. Koch argued the cause for respondent. With her on the brief was Bailey Pinney & Associates, LLC.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Mother appeals the trial court's order directing that legal custody of parents' two children be changed to father. She asserts that the trial court erred in determining that father had established that (1) there had been a substantial change in a party's capacity to parent the children and (2) a change of custody was in the best interests of the children. We review *de novo*, ORS 19.415(3), and reverse.

On *de novo* review, we find the facts as follows: Parents were married in 1989. Their older son, T, was born in 1991, and their younger son, S, was born in 1993. It is undisputed that mother has been the primary parent of both children throughout their lives. In 1995, the parents were divorced, and mother was awarded legal and physical custody of both children. Father had parenting time with the children on weekends, school breaks, and parts of summer vacations.

In the summer of 2005, father moved to change custody of both children to him, alleging that mother's ability to parent the children had deteriorated significantly. Father alleged that the children were unsupervised in their mother's care, that they were violent and disruptive, that they were doing poorly in school, and that mother was in violation of the parenting plan. Mother, in turn, responded that she should remain the custodial parent; mother also filed a countermotion seeking to hold father in contempt for failing to pay child support and for violating the provisions of the parenting plan.

The trial court ordered a custody evaluation, which was conducted by Billie Bell, a licensed clinical social worker. Bell, in turn, requested that mother, father, and the older child, T, undergo psychological evaluations. Bell also interviewed the parents and children and received information from collateral sources. Bell then produced a written custody evaluation. The picture that emerged, as set forth in those reports and evaluations, as well as in the testimony and exhibits at trial, is as follows.

Parents have an extremely contentious relationship and have for years engaged in prolonged and unpleasant disagreements about parenting time, child support, and child rearing. Father's communications with mother can be characterized as rude, domineering, and occasionally obscene. Similarly, mother's communications and actions, as they pertain to father, can be regarded as obstructionist and inflexible. Those disagreements have had negative effects on the children—in particular, the children have been exposed to derogatory statements about mother when they are in father's household. Both children express a strong preference to remain in mother's custody.

Mother, who lives in Sherwood, is single, and has a job as an administrative assistant. Her employment is sufficiently flexible that, at the time of the hearing, she had adjusted her work schedule so that she could be at home with the children after school. Mother prepares and eats dinner with the children in the evening and supervises S's completion of homework. In mother's home, the children each have their own bedroom, and T has use of the garage to pursue his hobby of drumming.

Father lives in Beaver, near the Oregon coast, approximately a two-hour drive from mother's home. Father is self-employed and also has the ability and the willingness to adjust his schedule in order to supervise the children. Father resides, with his long-time partner and their preschool-aged child, in a double-wide trailer that has two bedrooms and is located on a large piece of property. Both parents have limited financial resources; although mother has health insurance for the children, it appears that some of the mental health services needed by at least one of the children, described in more detail below, may not be fully covered by that insurance.

Until T entered adolescence, the children appear to have had few, if any, significant behavioral issues. Sometime around 2004, mother found T unclothed in a room with his girlfriend, who was clothed. During the 2004-05 school year, mother received a report from T's school that he had deliberately made cuts on his arm; mother believed that her own therapist, whom she had arranged for T to see on a number of

occasions, was addressing that issue with T. Meanwhile, although T had historically been a strong student, his grades dropped somewhat—from As to Bs.

In the summer of 2005, while T was residing with father during father's parenting time, T began to cut his arms again and also to burn himself on the arms. At various times, father caught T killing insects, constructing an animal grave-yard, and building a bomb from fireworks. Also in the summer of 2005, while T was residing with father, father caught T smoking marijuana.

After mother found out about the marijuana incident—not from father but, instead, from the parent of another of the children involved—she investigated T's friends and their families and ultimately provided the police with information she had discovered about their use of drugs. Mother also discovered an empty aerosol can in her garage that she suspected—correctly as it turned out, as T ultimately admitted that he had passed out from "huffing"—might have been used by T to get high.

In response, mother arranged for T to be evaluated by her therapist, whom she believed to be qualified to conduct a drug and alcohol evaluation, and also scheduled T to see a psychiatric nurse practitioner. The nurse practitioner prescribed antidepressants for T in the fall of 2005 and began providing counseling to him, after which both parents reported that he seemed to be somewhat improved. Mother forbade T from seeing the friends who had been involved in using drugs, and also began doing random urine tests on T up through the date of the hearing, all of which showed negative results.

During the 2005-06 school year, after the change of custody petition had been filed but before the hearing in this case, problems with the children continued. Mother discovered that T had displayed suggestive materials on his My Space Internet site, and S began to engage in troubling behavior. Mother testified that S had been in trouble at school for writing on his arm that one of his teachers "sucks."[1] Father testified that S had been in trouble for stealing and

---

[1] S had historically been a C student, and that did not change significantly.

fighting, but that his behavior had improved in the months before the hearing. Father also discovered that S had written a "Dear Santa" letter that contained obscenities. When mother first learned of the "Dear Santa" letter, several weeks before the change-of-custody hearing, she arranged for S to see a counselor.[2]

Parents continued to have disagreements about parenting and parenting time up through the time of the hearing, as evidenced by, for example, an e-mail exchange in which mother asked father to see that S completed his homework during his weekend visit with father, and father's e-mail response: "Shut up! I'm done with you and your bullshit. Contact me if the boy's [*sic*] are hurt, otherwize [*sic*] stuff the rest in your ass!" During that time, T became more and more reluctant to go to father's house for scheduled parenting time.

In late 2005, at Bell's request, both parents underwent psychological evaluations. Although the psychological reports went into detail about each parent's strengths and weaknesses, they did not indicate that either parent had major psychological issues that would call into question either's ability to parent.

Shortly thereafter, Dr. Lorah Sebastian performed a psychological evaluation of T. That evaluation revealed that T had been cutting himself in the previous year because the pain took his mind off other things. T had also burned his arms in the fall of 2005. He acknowledged to Sebastian that he had set fires and made bombs when he was younger, and that, several years earlier, he and a friend had stuck a pencil into a cat's anus—conduct he described as "amusing."

Sebastian found that T was bright and articulate, but that he had low self-esteem and, without treatment, his antisocial and self-abusive behaviors could escalate. She diagnosed T with cannabis dependence in early partial remission, as well as an adjustment disorder with mixed emotional features including anxiety and depression.

---

[2] Although father apparently knew of the "Dear Santa" letter shortly after it was written, he did not inform mother of that fact.

Sebastian, as well as Bell, strongly recommended that T receive individual counseling with a specific counselor and, preferably, that he participate in an adolescent dialectical behavioral therapy (DBT) program, designed to address the type of behaviors he had exhibited. Sebastian testified:

> "[T is] basically what I would say kind of standing on the edge of a diving board with no water in the pool. He needs some help with regard to direction. He's had some issues with drug involvement that, you know, could recur or could not recur. But he doesn't appear to have any structure about how to deal with the kinds of issues that he has, and that's what DBT will teach, given him some—teach him some tools and skills, and then also give him some treatment for some sort of direction and goal in his life. It's a very kind of goal-oriented treatment."

The DBT program recommended by Sebastian is available only in Portland. The counselor whom Sebastian and Bell recommended was not covered by mother's insurance; consequently, at the time of the hearing, mother was attempting to find a therapist for T that met with Sebastian's and Bell's approval and was covered by her insurance.

Bell testified at the hearing that she was extremely concerned about T's mental health and was not impressed with either parent's ability to get him help. She indicated that she did not think that either parent had taken his problems very seriously at first—but also rejected the suggestion that the problems were simply a result of his being in mother's custody. Bell attributed some of the children's recent problems to their stress over the custody dispute and their parents' ongoing disputes.

Ultimately, Bell recommended that mother retain custody of the children. She based that recommendation on mother's status as the primary caretaker, the children's expressed desires, and the desirability of keeping them in their schools, near their friends, and in a metropolitan area where services are readily available. Bell observed that a change to father's custody would involve the children losing their primary parent, a move to an isolated area, a change of schools, and the loss of their friends. She further observed that, in her experience, given the children's ages and their

desires to remain with mother, it was unlikely that a change of custody would be successful.

The trial court granted the change of custody. In her oral ruling, the judge expressed profound concerns about both children's behavioral issues and about T's mental health in particular. The court described the testimony as disclosing "some of the most disturbing information that I've heard about kids in a long time, maybe ever" and repeatedly characterized the circumstances as "traumatic," "frightening," and "drastic": "The situation is drastic enough that it seems to me a drastic remedy is what needs to be done at this point."

The trial court further noted that both parents' unwillingness to work together to meet the children's needs was of great concern. Ultimately, the court concluded that, because mother had had custody of the children, it was her responsibility to ensure that the children received the help that they needed—and that she had failed in that regard. The court emphasized that it was granting the change of custody, notwithstanding Bell's recommendation and the children's expressed preference, because of the children's needs "for structure, for treatment, for discipline, for somebody really paying attention," and admonished father:

> "I'm going to take you at your word because you haven't had a chance yet, and something dramatically different has to happen here or Dr. Sebastian's predictions will come true."

Mother appeals, arguing that the trial court erred both in determining that there had been a substantial change of circumstances and in determining that a change of custody was in the children's best interest. Because "change of circumstances" and "best interests" are conjunctive conditions for a modification of custody, *see, e.g.*, *Garrett and Garrett*, 210 Or App 669, 671, 152 P3d 993 (2007), mother is entitled to prevail if the trial court erred in either regard. For the reasons that follow, we conclude that the trial court erred in finding the requisite change of circumstances. Accordingly, we reverse.[3]

---

[3] Given our analysis and disposition, we do not address the "best interests" inquiry.

Mother notes that the "change of circumstances" inquiry is not merely whether any change of circumstances has occurred—but, instead, whether a change has occurred "that *relates to the capability of one or both parents to care for the child." State ex rel Johnson v. Bail*, 325 Or 392, 398, 938 P2d 209 (1997) (emphasis added). In particular, mother posits, where the allegation is that a parent is not providing adequate care and supervision, "these events must be of such a nature or number that reflect a course of conduct or pattern of inadequate care which has had or threatens to have a discernable adverse effect upon the child." *Collins and Collins*, 183 Or App 354, 358, 51 P3d 691 (2002) (quoting *Niedert and Niedert*, 28 Or App 309, 314, 559 P2d 515, *rev den*, 277 Or 237 (1977)). Mother asserts that the record demonstrates that she neither caused the children's problems nor failed to address them as they arose—and, thus, that father failed to show the requisite change in circumstances.

Father responds that he adequately demonstrated, and the trial court properly found, that mother is incapable of appropriately parenting the children, which constitutes a change of circumstance. In that regard, he specifically asserts that mother, as the custodial parent, failed in her responsibility to provide adequate structure, discipline, therapy, and medical intervention for the children.

We reject at the outset the idea that anything in the record indicates that mother's own lifestyle or circumstances have altered in any way that is significant. That is, the record does not reflect that mother has decreased the amount of supervision she provides the children, that she has altered their living arrangements in any way that is detrimental to the children, or that she has experienced significant mental, physical, or emotional problems that have affected her ability to parent. *See, e.g., May and May,* 136 Or App 481, 484, 901 P2d 938 (1995) (mother's extreme intoxication, leaving five-year-old child unattended in home, failing to provide child with clean clothes, regular meals and baths, and requiring child to live in squalid and unsanitary conditions constituted a course of conduct or pattern of inadequate care justifying change of custody). Rather, father's emphasis is on two other considerations, *viz.*, that, as the trial court determined, mother "has not apparently been able to handle parenting

these kids with the difficulties that they present, and there has been an absolute inability to work with the kids' father to help the kids."

■■ As the trial court understood, a custodial parent's unreasonable failure to communicate with a noncustodial parent about substantial matters pertaining to the children can constitute a material change of circumstances.

> "A component of the capacity of a custodial parent to take care of a child properly is the promotion by the custodial parent of a healthy relationship between the children and the noncustodial parent. Thus, depending on the facts of a particular case, anger, hostility, and interference with a noncustodial parent's parenting time may constitute a substantial change of circumstances for purposes of a change of custody."

*Garrett*, 210 Or App at 673.

Here, however, the lack of communication was hardly unilateral—and, indeed, was not primarily attributable to mother. On *de novo* review, the record reflects the unfortunate fact that neither parent was communicating important information about the children to the other parent in a satisfactory manner. For example, mother did not learn about the incidents of T's animal abuse that father witnessed until shortly before the hearing, nor was she aware of S's "Dear Santa" letter until that time. Moreover, she learned from another parent—and not from father—that father had caught T smoking marijuana. Conversely, mother did not reveal directly to father what she had learned about T's "huffing"; nor did she disclose to father before the hearing that she had arranged for S to see a counselor.

The record also reveals that parents squabbled almost incessantly about the details of parenting time. However, on this record, it appears that father's communication and behavior in that respect were at least marginally worse than mother's behavior. For example, there is evidence that father on several occasions did not pick up or drop off the children at the arranged times and failed to inform mother of his change of plans. On one of those occasions, the younger child was left unsupervised for some time because mother was not at home when father dropped him off.

Mother testified that, when she tried to talk to father, "he hangs up on me. He's belligerent to me. He's mean to me. He laughs at me. And he says, 'I don't want to hear it.' " Father acknowledged at the hearing that he had a problem with speaking with mother on the phone and had, consequently, instructed her that she needed to communicate with him by e-mail. However, as noted above, *see* 215 Or App at 470, even father's e-mail communication was, at least on occasion, hostile, bullying, and crude. By the time of the hearing, mother had concluded that "it was safer to communicate through the attorneys."

The circumstances here are notably distinguishable from those in *Garrett*, where the trial court changed custody from the father to the mother, and we affirmed. There, as here, communication between the parents had broken down "and conflicts arose over parenting schedules, transportation of the children, trade-off times, child support, medical costs, and other issues." 210 Or App at 672. In that case, the father, the custodial parent, was "verbally abusive when they talked on the phone or exchanged the children." *Id.* Moreover, the father screamed at and threatened the mother on the phone, engaged in a physical altercation during which the police were called, and exhibited hostility to police officers in the children's presence. *Id.* at 672-73. In that case, we concluded that "the escalation of father's anger in his dealings with mother constitutes a substantial change of circumstances that warrants a determination about whether the best interests of the children require a change of custody of the daughter." *Id.* at 674.

Here, in contrast, the amount of hostility exhibited by both parents has remained unfortunately consistent for years. Further, in this case, it is father, the *noncustodial* parent, who has exhibited the greater degree of hostility. Indeed, and consistently, Bell reported that the children had been exposed to more negative comments about mother in father's home than vice versa. In sum, although it is clear that the parents' ongoing hostility to each other continues to injure their children, this is not a situation in which mother's interactions (or lack thereof) with father are so extreme as to represent a change of circumstance in her ability to parent.

■     The trial court's other overarching concern was that mother "has not apparently been able to handle parenting these kids with the difficulties that they present." The trial court indicated that mother, as the custodial parent, was the one whose responsibility it was to get help for the children, and that she had failed to do so. *See* 215 Or App 472. On *de novo* review, we again disagree.

We begin with S. The record reflects that S has had academic—and, to a lesser extent, behavioral—issues at school. But the record also shows that mother was aware of the situation and had been in contact with the school to address those issues. The record further shows that mother helps S with his homework and has encouraged father to do so as well—albeit apparently unsuccessfully. Finally, after mother learned of S's "Dear Santa" letter, she promptly arranged for him to see a counselor. The trial court chided mother for arranging that counseling without consulting father, but, on review, we conclude that mother's decision to handle communication with father through her attorney at that point, two weeks before the hearing, was not unreasonable.

■     T's circumstances are, obviously, more complicated. By the summer of 2005, mother had knowledge that T had cut his arms and had experimented with drugs. Her response was to arrange for T to receive counseling with her own therapist, whom she believed to be competent to address T's problems. The custody evaluator, Bell, disagreed that mother's therapist was an appropriate choice for T, given his therapeutic relationship with mother, and in light of Sebastian's conclusion that T should receive dialectical behavioral therapy.[4] However, Bell went on to explain that "oftentimes people that don't know any better engage with therapists who aren't qualified to do the work that they do because they present that they're qualified to do it." Although it is true that mother could have made a better choice of therapists for T,

---

[4] Bell further indicated that, although that therapist had done a drug assessment of T, Bell did not believe that he was qualified to do so. The record, however, contains no information as to that therapist's credentials or, in fact, any information about the results of his drug assessment of T.

the primary point is that she recognized his need for treatment and acted on that recognition; the failure to appreciate a potential conflict of interest is decidedly secondary. Further, to disparage mother for failing to anticipate that T would benefit from DBT months, even years, before Sebastian (and Bell) recommended such therapy would be to impose an impossible standard of prescience.

Bell also indicated that both parents underestimated, or downplayed, T's problems to some extent—but she further believed that, by the time of the hearing, both had a better understanding of his problems. We do not view mother's failure to understand the extent of T's problems as "reflect[ing] a course of conduct or pattern of inadequate care which has had or threatens to have a discernable adverse effect upon the child." *Collins*, 183 Or App at 358. The record indicates that a number of T's most troubling behaviors occurred when he was with father—such as the incidents of animal abuse that father witnessed and the marijuana incident—and that much of T's self-mutilation behavior occurred when he was with father as well. In light of the fact that father did not share that information with mother, her ignorance of the extent of the problems does not demonstrate inadequate care on her part.

In sum, this is not a case that involves "inadequate care," as that term is commonly used. That is, the record shows that mother takes the children to school, has adjusted her work schedule so that she can supervise the children after school, provides them dinner, helps them with homework, checks with their friends' parents regularly, communicates with their schools, and has arranged therapy for them. Despite receiving such care and supervision, T has behavioral and mental health problems, and S has academic problems and, to a lesser extent, some behavioral issues as well. Despite receiving such supervision, the children, particularly T, have engaged in seriously concerning behaviors—and done so, at least in part, on mother's "watch."

It is, indeed, tempting, when faced with adolescents whose lives are—or may soon be—spiraling, to reach for a "drastic" remedy. But, putting aside whether there is any

reasonable prospect that the children would, in fact, fare better with father, we are unpersuaded that mother's efforts to monitor and address the children's needs and problems have been so deficient as to constitute the requisite change of circumstances. There are, we appreciate, circumstances in which, notwithstanding a custodial parent's best and most careful and loving efforts, an adolescent child will engage and persist in profoundly disturbing, even self-destructive, behaviors. Ultimately, however, it is not the child's conduct—but, instead, the custodial parent's effort—that determines whether the parent has engaged in a "course of conduct or pattern of inadequate care." *Collins*, 183 Or App at 358.

Here, the record does not establish that mother's response to the children's circumstances was so deficient as to represent a "course of conduct or pattern of inadequate care." *Id.* Consequently, father failed to show the requisite change of circumstances relating to mother's "capability * * * to care for the child[ren]." *Bail*, 325 Or at 398.

Reversed.