Submitted December 4, 2009, reversed and remanded for entry of judgment granting legal and physical custody of child to father and for development of a plan giving mother reasonable parenting time; supplemental judgment for attorney fees vacated and remanded August 11, 2010

In the Matter of the Custody of D. T. J. S-B,
a Minor Child.

Charles Andrew BUXTON,
*Co-Petitioner-Appellant,*

*v.*

Erica Lynn STORM,
*Co-Petitioner-Respondent.*

Multnomah County Circuit Court
020362434; A136958

238 P3d 30

Adam L. Dean and Coit and Dean, PC filed the opening brief for appellant. With him on the reply brief was Haley Griffith, Certified Law Student.

Erica Storm filed the brief *pro se*.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

579-a

ORTEGA, J.

## ORTEGA, J.

Father appeals the trial court's judgment denying his motion for a change in custody of the parties' son. We review *de novo*, ORS 19.415(3) (2007),[1] and conclude, consistently with the trial court's judgment, that the increased conflict between the parents and the effect of that conflict on child constitutes a substantial change in circumstances. After due consideration of the trial court's ability to assess the parties' credibility and demeanor, *Cooksey and Cooksey*, 203 Or App 157, 172, 125 P3d 57 (2005), we nevertheless disagree with its ruling on best interests and conclude that changing custody to father is in child's best interests. Accordingly, we reverse and remand for entry of a judgment granting custody to father.

The litigation between the parties is highly contentious and has extended over several years, including a prior custody order in 2005. Before we begin a chronological review of the record, we highlight four themes that emerge from that review. First, mother has repeatedly accused father of serious crimes, but all of those accusations have proved unfounded. Second, mother has repeatedly excluded father from participating in various medical and psychological interventions to treat and evaluate child, calling into question the validity of some of those interventions. Third, after father was granted increased parenting time, child's behavioral problems escalated in ways that appear to have been driven by mother's influence. Fourth, the experts who evaluated the case have not arrived at a definitive diagnosis, but they all characterize child as displaying symptoms of anxiety, some developmental delay, and aggressive behavior, and all, to at least some degree, attribute child's problems to the conflict between the parties.

We proceed to a recitation of the pertinent facts. Mother and father began their relationship in 1999 and never married. Child was born in December 2001. Mother and father separated completely in 2002 when father moved to the Seattle area, where he continued to reside at the time

---

[1] Because the notice of appeal in this case was filed before June 4, 2009, we apply the 2007 version of ORS 19.415. Or Laws 2009, ch 231, § 3.

of the custody hearing at issue. Their final failed attempt to reconcile occurred toward the end of 2003.

Father has a GED and is a plumber. During the relevant time period, he has had sole custody of his teenage daughter, B. B and mother have a strained relationship; at one point, mother alleged that B posed a physical threat to child, but one year later, mother acted inconsistently with that allegation by inviting B to visit child in mother's home.[2] Father currently resides with his fiancée, Nicole, and her daughter E, who is two years older than child. Both B and E are doing well in father's home and have bonded with child.

Mother has earned a J.D. and formerly practiced law. She is single and has a son, DT, who is five years younger than child. Mother's relationship with DT's father was conditioned on his lack of involvement in DT's life. DT is doing well in mother's home and is bonded with child. Mother generally lives with at least one roommate.

The parties have been in litigation since mother's pregnancy with child. Before litigating custody, they filed several restraining orders against each other, which were vacated soon after filing. Soon after child was born, mother drafted a stipulated custody judgment, which the parties agreed to set aside shortly thereafter. When child was seven months old, they entered into a second stipulated judgment, also prepared by mother, granting mother sole custody and father extremely limited parenting time.

About a year later, father moved to change custody, and the parties stipulated to an order appointing Bell, with whom they had already worked once before, to conduct a custody evaluation. At Bell's request, mother and father underwent psychological evaluations. The evaluator, Gwin, reported that mother's test results showed signs of moderate to severe depression and a tendency to feel overburdened, blocked, or trapped. Gwin was concerned that mother would be prone to attempt to alienate child from father, noting that mother is "disposed to dichotomize someone * * * [and] could be quickly sensitive to her child's comments that favored the

---

[2] Mother invited B's mother (father's ex-wife) to move in with her. Mother then disclaimed any concern about B being a danger to child and encouraged her to visit.

other parent over her." Gwin reported that father's test results indicated a tendency toward sudden and intense emotional outbursts. She observed that father lacked insight and self-awareness and could be self-assertive, controlling, and difficult to coparent with; however, his "depth of parent-to-child bonding appears adequate to reasonably good." She observed that he did not dichotomize people and "is not likely to be especially sensitive as to whether his child's comments are for or against him or the other parent."

Each parent expressed concern about the other during the evaluation process, but mother went further and, during that process, accused father of at least three serious crimes, none of which could be substantiated. First, she reported to Bell and to the police that father had stolen cash (her reports varied from $30,000 to $60,000) that she held for a "mafia" client. However, the record does not indicate that father was ever investigated for theft, although mother's change to inactive status with the Oregon State Bar is related to the missing cash, by her report. Second, mother accused father of setting fire to his trailer home, but father submitted to a polygraph test and eventually was cleared by police investigators of having set the fire. Third, mother reported to Bell that father had sexually abused child. A CARES NW examination found no evidence of abuse; the Department of Human Services recommended supervised parenting time for father for his own protection and then closed the case as unfounded. Father also submitted to another polygraph test, which supported his denial of any sexual abuse.

Mother continually pushed Bell to recommend supervised visits for father, but Bell did not see a need for supervision. Although mother never once asserted during several contacts with Bell and Gwin that father had physically or sexually abused her, she obtained a second psychological evaluation by Mallory during that same time period; in the Mallory evaluation, she reported physical and sexual abuse by father. In light of mother's report, Mallory interpreted mother's test results as if domestic violence had occurred and determined that mother had a "well-balanced personality style" and "would make a positive and effective primary custodial parent." Mother's reports of abuse are

otherwise unsubstantiated in the record. Mother finally acceded to father's requests to increase his parenting time to two entire weekends per month and six weeks during the summer without mother's supervision, but mother insisted that the exchanges occur at Safety Matters, a supervised exchange site for cases that typically involve domestic violence.

Bell's custody evaluation, completed in August 2004, when child was not quite three years old, reflected concern about both parents and the friction between them. Bell recommended that they share custody in the short term. She concluded that father was the more likely to facilitate and encourage a relationship with mother and was more capable of recognizing his weaknesses and past poor choices. Although mother was the primary parent, Bell had concerns that mother would undermine father's relationship with child. Bell also expressed concern "regarding the type of bond that [child] has with his mother given her personality style and the ongoing allegations against * * * father." Bell was very concerned about the timing of mother's abuse allegations, her blaming father for the fire in his home, and her unilateral decisions to reduce or terminate visitation. Bell found no credible indicators of domestic violence. She noted that, "when the case somewhat slows down there are new allegations, assertions and I caution counsel regarding where this case is going." She concluded with the hope that "within the next two years one or both of the parties can get themselves in a healthier position" and admonished that, "if [child] is in therapy[,] both parents need access to the clinician so a one sided statement paper does not come out regarding the other parent."

The 2005 custody determination, reached when child was three years old, followed a two-day trial. The court increased father's parenting time to two weeks per month but did not find a substantial change of circumstances and therefore did not modify the award of sole custody to mother. The court noted that it had "some concerns about [m]other's fitness as a parent, but these concerns are not significant enough to merit a modification of legal custody." The court was satisfied that mother could care for child on a day-to-day basis.

Conflicts persisted between the parents, culminating in this second attempt by father to obtain a custody modification, which he initiated in December 2005 and which was tried in the summer of 2007. Keeping in mind that the parties assess child's behavior and emotional problems quite differently, we consider the psychological evaluations that child has undergone since the last custody review. Despite Bell's admonitions regarding the importance of involving both parents in the professional services offered to child, mother has maintained sole control over nearly all such services.

Child has received at least three evaluations and regular counseling at Morrison Child and Family Services, all without father's participation. During the first evaluation, mother falsely reported to Dr. Stanford that father was aware of the evaluation, but was "not interested in becoming involved in [child's] psychiatric care." Mother reported to evaluators that father had been violent toward her and had "mentally abused" child. Stanford gave child an Axis I diagnosis of "Parent/Child Relational Problem" and noted severe psychosocial stressors related to the custody battle. He recommended parenting training, efforts to involve father in therapy, and "[a]ctive separation of [child's] presentation from biases that may be presented in the context of secondary gain related to [the] custody battle." Mother did not agree with Stanford's diagnosis and later attempted to have the report removed from child's file. Stanford's evaluation occurred before the 2005 custody determination, but mother was the only party aware of it and did not present it to the court at that time. Additionally, her attorney contacted Morrison and instructed that father could not be involved as part of child's therapy and could only review the treatment records.

Child continued therapy at Morrison and received a second evaluation without father's involvement. The evaluating psychologists agreed with an earlier diagnosis of Pervasive Developmental Disorder, not otherwise specified (PDD-NOS), reached by the Child Development and Rehabilitation Center (CDRC, discussed below), and noted that child had engaged in clear acts of aggression toward mother and that attachment issues should not be ruled out. The evaluators opined that frequent changes in child's

routine resulting from transition between households had a negative effect; they recommended fewer transitions, as well as counseling to address his relational and communication difficulties. In response to mother's report that child had witnessed domestic violence, the evaluators recommended further assessment.

During child's final Morrison evaluation—in which, again, father was not involved—mother continued to report that she had concerns about behavioral changes around visits with father and that child had witnessed domestic violence. The evaluator diagnosed PDD-NOS, "accompanied by difficulties in emotional regulation, social interactions and communication," with possible post-traumatic stress disorder (PTSD). The evaluator recommended counseling for behavior issues and anxiety, noting that it is in child's best interest to minimize transitions between the parents' households.

During an overlapping time period, CDRC twice evaluated child through the Autism Clinic. Mother sought the first evaluation after the trial for the 2005 custody determination, and father was only minimally involved. As during the Morrison evaluations, mother reported a history of domestic violence, but this time she expressed the belief that child had not witnessed any violence. CDRC provisionally diagnosed PDD-NOS, with possible PTSD related to the visitation schedule and domestic violence. The evaluator recommended that both parents actively work with mental health professionals on parenting and supervision. The evaluator noted that children of child's age (then four years old) who are "exposed to domestic violence, maternal depression, and a chaotic lifestyle often display behavior typical of children with autism." Determining the cause of child's behaviors was critical to providing appropriate treatment. The evaluator recommended that child continue mental health services and return for reevaluation in approximately two years because the "team had concerns that [child's] behaviors were secondary to emotional distress rather than a developmental disorder."

Almost two years later, when child was five and one-half, at the request of a second custody evaluator, Dudley,

and child's appointed attorney in the context of this second custody proceeding, CDRC again evaluated child. That evaluation was the only psychological evaluation of child in which father had full access throughout the process and participated equally with mother. Although mother believed child's problems were more serious than father did, both parents were concerned about child's anger and aggression.

The CDRC team concluded that child no longer met the criteria for PDD-NOS and did not report concern regarding possible PTSD or domestic violence, but had concern "about the long-term psychological impact of [child's] parents' custody battle and related parent conflict." They recommended an occupational therapy evaluation and that "parents continue to work together and communicate to best meet all of [child's] needs."

The efforts of third parties to assist parents in resolving their conflicts were not successful. For example, after the 2005 custody determination, the court ordered parents to use a parent facilitator, Dr. Sabin, to resolve any disagreements regarding child's health, welfare, and education. Sabin noted that the parties disagreed regarding child's diagnosis and that mother appeared invested in child "having extreme special needs" and father was "invested in [child] as having no special needs." She felt that reality was probably "somewhere in between" those two extremes. Sabin recommended that child have a therapist with whom both parents could meet. Mother did not want child to see a therapist without her, however, and would not give Sabin child's insurance information for a therapist referral when child's therapy at Morrison ended. About six months after being appointed, Sabin terminated services because of mother's "unwillingness to pay for my services and other issues."

Sabin had recommended that mother enter dialectic behavioral therapy (DBT) because of "difficulties with emotional modulation" and because she has "historically sought therapists specializing in domestic violence who are very supportive of her and do not challenge her to think about her own role in the parental conflict." She also thought that father would benefit from counseling; apparently as a result, father and Nicole completed anger management classes in 2006.

Meanwhile, mother began DBT in October 2005 with Peters, who diagnosed her with an Anxiety Disorder, Not Otherwise Specified, noting that mother "tends to go on the offensive" with her fears.

After father initiated this custody proceeding in late 2005 and mother moved for more parenting time, the court appointed attorney Smith to represent child and ordered a custody evaluation by Dudley, a psychologist who has completed hundreds such evaluations. Over 12 months, Dudley completed a thorough evaluation that included observations of parents and child, including a visit to father's residence and three to mother's; review of reports and evaluations; interviews and psychological testing of mother, father, and Nicole; and review of three hours of recorded phone calls provided by mother and a DVD of child that was provided by father. Both Dudley and Smith ultimately concluded that custody should be changed from mother to father.

Dudley's custody recommendation was not a "close call." Dudley emphasized that, after the 2005 custody determination, child's behavioral problems escalated in ways that suggested mother's influence and that the parental conflict was destructive to child. Although mother believed that child suffers from PDD or an autistic spectrum disorder, nothing in child's behavior led Dudley (or child's current therapist, Hubbard) to such a diagnosis. Rather, child consistently presented with age-appropriate behavior and normal speech and activity throughout visits and interacted in a warm and affectionate manner with both parents. Dudley concluded that, "while some mild developmental delays have been noted in the record, much of [child's] emotional and behavioral difficulties are a function of a highly dysfunctional family situation."

Dudley completed psychological tests of father, Nicole, and mother. He found father to be a relatively calm and extroverted person with high self-esteem, who can be "rather assertive and potentially domineering," and a concrete thinker who "is not vulnerable to situational stress and who approaches problems in a very pragmatic and matter of fact manner." Nicole is energetic and generally concrete in her thinking, but relatively accommodating and unassertive.

Mother is "more anxious and high strung than most," very rule conscious and structured, but also "very reactive to situational stress" with "difficulty modulating [her] feelings of anxiety" with elevated "hypersensitivity and suspiciousness * * * suggestive of clinical paranoia," particularly in regard to father.

Dudley noted disturbing trends in child's behavior after the 2005 custody determination. Father reported to Dudley that, after having phone contact with mother, child tended to act out more, often toward Nicole. Dudley was particularly concerned about child's extremely negative statements about Nicole, which were "indicative of alignment or alienation, or at the very least, exposure to extreme negativity towards [Nicole] on the part of [mother]." Child displayed increasing verbal and physical aggression toward Nicole. For example, he spat at Nicole, hit her, and threatened to cut off her face and hands and to slice her throat open and kill her. He called her a "f-ing bitch," "slut," and "ho." Child's therapist, Hubbard, indicated that, in light of child's age, child was likely repeating something he had heard in referring to Nicole as "Nick-ho."

Father and Nicole reported an incident when father awoke during the middle of the night to find child standing next to the bed with a baseball bat in hand. When asked what he was doing, child said that he was going to hit Nicole in the head while she was sleeping. When father asked why, child said, "My mom told me to." Nicole testified that, on another occasion, child reported that mother was going to have somebody kill Nicole; during a trip to the store, child was "looking all around and he was just acting scared and wanted to hurry up and get back to the house" so that they would be safe.

Another development that Dudley found concerning was that, when in mother's care or during parent exchanges from mother's house, child would occasionally wear nail polish and girls' clothing. Further, mother had both of child's ears pierced. Mother claimed that child wanted to wear earrings and have his nails polished, but she also testified that she believed father to be homophobic. Father reported to Dudley that he did not approve of child wearing the earrings that mother sent him wearing, which impressed Dudley as

being rather feminine. Nicole testified that, after arriving with his ears pierced the first time, child stated that he was "gay" because "[t]hat's what my mom said." Sometimes the polish would not come off with polish remover, and child informed Nicole that "his mom put [s]uper [g]lue over the top to make it stay." Dudley was concerned about these aspects of child's appearance because they were "in sharp contrast with how I observed him playing at both households, which was generally more kind of stereotypic[al] male play behavior."

Eventually, the court ordered that "[n]either party shall return the child to the other party with nail polish on his fingernails." Dudley testified that child's feminine appearance "corresponding with visits to Dad, * * * heat[s] up the conflict between the parties." Additionally, Dudley expressed concern that, in the long term, it could create confusion for child "because it's not consistent with the boy's gender, and, by virtue of his play, his gender orientation."

Dudley also observed the effects of parental conflicts on child. Mother insisted not only that the parties use Safety Matters for child's transitions but also that she needed two days' advance notice for father to attend child's therapy sessions or doctor visits so that she could arrange a security escort. Dudley felt that mother did not want father involved and that child was "responding more and more to the parental conflict," becoming "a much more active participant" in the conflict. Sabin expressed similar concerns to parents that child was "learning to relate to each [parent] by saying negative things about the other."

Ultimately, Dudley felt that father was better equipped to provide for child's needs in the situation. He observed that mother has an "overly suspicious and paranoid personality style, and is predisposed to perceive pathology on the part of [child]," while father is "generally more emotionally stable." Dudley was more concerned about the "overall impact of parental psychopathology upon [child] relative to [mother's] overly suspicious perceptions, emotional reactivity, and tendency to perceive [child's] behavior in an overly pathological manner."

Child's attorney, Smith, agreed with Dudley's assessment of parents and advocated for a change in custody.

Smith communicated with child during several custody transitions and visited both parents' homes over the course of a year. She observed an increase in conflict between the parties and, after Sabin's resignation, eventually filled a role similar to a parenting coordinator, mediating disputes over matters such as telephone contact and visit transitions.

Smith testified about child's emotional display. During a visit at mother's home, Smith asked child, who was comfortably playing, to identify the people in photos in his room. Child calmly identified his mother, but when asked to identify his father, he

> "sprang up, grabbed the photo and threw it as hard as he could across the room and back into his closet. [Child] then stood there, his body completely rigid, his fists clenched and his face turning red as he screamed, 'That fucking man. That fucking man. I hate him. He's stupid. He's a liar.' "

Smith was alarmed at that complete change in demeanor. She "tried to calm him down[, but child] ignored all of that and sat back down on the floor and almost immediately started playing again." When questioned about it, child reiterated that his dad was a liar and that he was stupid, but was not interested in discussing why he made those comments or why he used that kind of language. In a later home visit with child at his father's house, Smith noticed that child also had photos of his mother. Curious to see if she would get a similar response there, she asked child, "How's your mom?" Child replied simply that he loved and missed his mom.

Smith also described events suggesting that mother had dyed child's hair and then accused father of maliciously doing so. Smith was present during the child exchange. When father was picking child up, Smith noticed that child's hair was bright red from dye that apparently had been recently applied: Smith had tousled child's hair, and it took a couple of days to get the color off her hand. Father indicated it was not the first time that child had arrived at an exchange with wet red hair. The very next week, Smith observed the return exchange. When Smith and child reached mother, mother pointed to child's head before greeting him, looked at Smith and said, "You see that? [Father] dyed his hair. He knew we were doing photos this week and he's ruined our

photos." Mother told Smith that father had done similar things in the past when he knew that she was going to have photos done or there was a special occasion.

During the custody evaluation period, mother made another accusation of criminal conduct by father. The Washington Department of Social and Health Services, Children Protective Services (CPS) received a report that father was "making and selling meth" and made an unannounced visit. Mother informed Smith that she was concerned because child had spoken of possible drug manufacturing paraphernalia, but Smith had noticed no evidence of drug use during her recent visit. CPS found no evidence of any drug involvement at father's house, determined the allegation was unfounded, and closed the case.

After several days of trial, the court concluded that the increase in parental conflict created a change in circumstances that negatively impacted child, but did not find that a change in custody was in child's best interests. Mother retained primary custody and father received reduced parenting time.

On appeal, father renews his arguments that the elevated parental conflict, in which child has become an increasingly active participant, constitutes an unanticipated change of circumstances and awarding father custody is in child's best interests because mother has excluded father from participation in child's medical evaluations and treatment, pursued diagnoses that avoided looking at how the conflict has affected child, and interfered with child's relationship with father and other family members. Father contends that he can best facilitate a relationship between child and mother.

For her part, mother argues that the parties' conflict and its effect on child did not increase sufficiently to create a change of circumstances and that, in all events, the court correctly determined that it was in child's best interest to remain with mother. She contends that she merely sought appropriate medical care for child and will best facilitate a relationship between child and father.

■    A party seeking a change of custody must show, first, that "circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed" since the entry of the last custody order and, second, that, "considering the asserted change of circumstances in the context of all relevant evidence, it would be in the child's best interests to change custody." *Boldt and Boldt*, 344 Or 1, 9, 176 P3d 388, *cert den*, ___ US ___ , 129 S Ct 47 (2008). We find such a change of circumstances here and conclude that changing custody is in child's best interests.

■■    Focusing on evidence that arose after the 2005 custody determination, *Greisamer and Greisamer*, 276 Or 397, 401-02, 555 P2d 28 (1976), we agree with the trial court that the escalated conflict between the parties has had an adverse effect on child sufficient to constitute a change in circumstances. Adequate care and supervision by the custodial parent includes the promotion of a healthy relationship between the child and the noncustodial parent. *Connelly and Connelly*, 215 Or App 465, 474, 169 P3d 1279 (2007). Where the claimed change of circumstances involves events of inadequate care and supervision, they "must be of [such] a nature or number [reflecting] a course of conduct or pattern [that] has had or threatens to have a discernable adverse effect upon the child." *Niedert and Niedert*, 28 Or App 309, 314, 559 P2d 515, *rev den*, 277 Or 237 (1977). Here, mother's pattern of actions has undermined child's ability to have a healthy relationship with father and embroiled child in the parental conflict.

Dudley's recommendation to change custody was based largely on the escalation of parental conflict. Dudley commented that, "given that I do a lot of this work, I see a lot of high-conflict families, and this is really one of the top of the list." He noted that child has made "some very unusual verbalizations [and] behaved in a threatening manner * * * that's pretty extreme."

Dudley's conclusion is consistent with our view of the record. Child's extreme comments and behavior—including verbal attacks on father and Nicole and standing over Nicole with a baseball bat in the middle of the night—

appear to reflect mother's influence. Child's grooming and appearance during transfers for parenting time with father seem calculated to provoke conflict. Mother has interfered with father's participation in child's medical evaluation and treatment, contrary to treatment providers' recommendations. All of that evidence supports the conclusion that the escalation of conflict between the parties, and particularly mother's evident role in that conflict, has had an adverse effect on child and represents an unforeseen change of circumstances.

■ ■    We next consider, in the context of all relevant evidence—including evidence considered at the prior custody proceeding, *Greisamer*, 276 Or at 401—whether changing custody is in child's best interests, *Boldt*, 344 Or at 9. In determining child's best interests, we consider the following relevant factors:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

ORS 107.137(1). A parent seeking to change custody must establish by a preponderance of the evidence that it is in the child's best interest to do so. *Id.*; *Smith and Smith*, 290 Or 567, 571, 624 P2d 114 (1981); *Holcomb and Holcomb*, 132 Or App 498, 503, 888 P2d 1046, *rev den*, 321 Or 94 (1995).

■ Here, although the trial court concluded that it was in child's best interests to remain with mother, we conclude otherwise. We address the trial court's findings regarding specific factors in our discussion below, but pause to note that the trial court specifically declined to make any credibility findings on issues where there was conflicting testimony, including the troubling issues regarding custody exchanges and child's involvement in the conflict, which figure prominently in our analysis. The record contains testimony and recommendations from neutral professionals who had extensive opportunities to evaluate the circumstances. That body of evidence, which contains consistent and well-supported articulations of concerns about mother's involvement of child in parental conflicts, carries significant weight in our analysis.

We turn to an examination of each statutory factor. Two of the factors, ORS 107.137(1)(a) and (c), equally favor both parents. Child has emotional ties with other family members on both sides of his family, and he has an interest in continuing the relationships that he has with both parents. Thus, those factors do not weigh heavily in our analysis.

The statutory preference for the child's primary caregiver, ORS 107.137(1)(e), is more complicated. We agree with the trial court's finding that mother has been the primary caregiver and, "[s]eparate from consideration of other factors, * * * is a fit caregiver." However, in light of what the trial court termed mother's "near obsession" with micromanaging child's diagnosis and treatment and her approach to coparenting with father, we share the concerns regarding mother's parenting abilities that the trial court first articulated in the 2005 custody determination. Accordingly, we consider the preference for the primary parent outweighed by other factors under consideration.

We next consider the parties' interest in and attitude toward child, ORS 107.137(1)(b). We agree with the trial court's findings that (1) both parents have a positive image of child and love him, but on occasion have manipulated him in order to develop evidence for custody, and (2) father is more likely to allow child to be himself, but mother takes her concerns about his developmental problems "to the point of near

obsession." Although the trial court perceived some improvement in mother's attitude toward child's problems, that apparent attitude shift occurred under the watchful eye of the court during the six months preceding the custody determination. Also, both Dudley and Smith expressed the view that father was more stable, that child was more likely to thrive under his care, and that mother demonstrated a willingness to use child in an effort to manipulate father and build her case for custody. Her pattern of sending child to father's home with changes to his appearance apparently designed to provoke father, along with child's aggressive language and physical abuse toward Nicole, reflect mother's involvement of child in parental conflict that is destructive to child. Accordingly, like the trial court, we conclude that this factor favors father.

We next consider whether there is evidence of "abuse of one parent by the other." ORS 107.137(1)(d). We agree with the trial court that neither parent abused the other, as defined in ORS 107.705, and that this factor does not favor either parent.[3]

▪        Most significantly, we address each parent's willingness and ability to facilitate and encourage child's relationship with the other parent. The trial court explicitly declined to resolve conflicts in testimony regarding problems with custody exchanges and mother's role in fomenting conflict between the parties. Choosing to rely only on undisputed facts, the court found by a "close call" that mother was more likely to facilitate and encourage a continuing relationship between father and child. We consider the entire record, not only undisputed facts. Our *de novo* review of the record leads us to conclude—consistently with the views of Dudley, Smith, and Bell—that father is more likely to facilitate and encourage a positive relationship with mother than the reverse.

Mother's interference with father's relationship with child has been severe. Mother has a pattern of making

_____

[3] The trial court commented, "That does not mean that [mother's] feelings of fear and distrust of [father] are unjustified." On this record, we are not satisfied that mother's feelings are justified, and we note that mother's history of making unfounded criminal allegations and accusations of abuse has played a part in escalating the conflict between the parties that has been so destructive to child.

unsubstantiated criminal accusations against father, has obstructed his access to child's treatment providers, and has sent child to father's house with changes in his appearance designed to provoke conflict. By contrast, father has engaged in minor interference with mother's telephone access to child during visits, and father reports that mother likewise denied him telephone access. Although both parents should have telephone access to child, father's behavior does not give rise to the same concerns as mother's pattern of behavior. Accordingly, although we share the court's concerns about both parties, we conclude that this factor favors father.

Considering all these factors together, we are persuaded that it is in child's best interests for father to have custody. Both parties have contributed to the parental conflict, but mother's escalation of that conflict, heedless of the effect on child, shows a willingness to disregard child's needs and has been damaging to child. Both Dudley and Bell had the opportunity to observe child and parents at both households over the course of several months; Bell's evaluation provides early support for Dudley's later determination that mother tends to pathologize child and that father is more accepting and more willing to recognize the effect of the parental conflict on child. Smith likewise observed child and parents over an extended period, and she too advocated a change in custody. We likewise conclude that a change in custody is in child's best interests.

■ Finally, we address the issue of attorney fees. Both parties appeal the attorney fee ruling, which ordered father to pay $26,931.53 toward mother's fees and $15,000 toward child's attorney's fees, and required mother to pay the balance of her own fees and $5,000 toward child's attorney's fees. Given our disposition of this appeal and the lack of adequate findings in the record,[4] we vacate the attorney fee award and remand for the trial court to address the issue of fees.

---

[4] Mother claims that the court made discretionary findings in a hearing held July 2007, but that hearing was not recorded and a transcript is not available. At a September 2007 hearing, the court indicated that that it would make discretionary findings on the pertinent ORS 20.075 factors when the court issued an order on attorney fees, and the January 2008 supplemental judgment incorporates "substantive [f]indings and rulings from trial," as the basis for award of attorney fees. However, we have not located any such findings in the record.

Reversed and remanded for entry of judgment granting legal and physical custody of child to father and for development of a plan giving mother reasonable parenting time; supplemental judgment for attorney fees vacated and remanded.