Argued and submitted September 5, 2019, resubmitted en banc September 21, 2020, reversed March 10, 2021

In the Matter of the Marriage of

Amy JOHNSON,
nka Amy Royster,
*Petitioner-Appellant,*
*and*

Rick JOHNSON,
*Respondent-Respondent.*

Deschutes County Circuit Court
17DR10220; A167235

483 P3d 1174

In this appeal of a judgment modifying child custody, mother contends that the trial court erred in changing legal custody of the parties' child, J, from mother to father. When J was an infant, mother was awarded sole legal custody. When J was eight years old, the trial court gave father sole legal custody. At that time, the court determined that there had been a substantial and unanticipated change of circumstances and that, on the whole, it was in J's best interests that father have legal custody rather than mother. In her first assignment of error, mother argues that the trial court erred in its change-of-circumstances determination, because the evidence was legally insufficient to establish a material change of circumstances for purposes of custody modification. Alternatively, in her second assignment of error, mother argues that the trial court erred in its best-interests analysis by failing to give mother the statutory presumption for the primary parent. *Held*: On this record, the trial court erred in modifying the custody judgment, because the evidence was legally insufficient to establish a material change of circumstances for purposes of a change of legal custody.

Reversed.

En Banc

Bethany P. Flint, Judge.

George W. Kelly argued the cause and filed the briefs for appellant.

Kristin M. Larson argued the cause for respondent. Also on the briefs was Hansen & Larson, LLC.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Lagesen, Tookey, DeHoog, Shorr, James, Aoyagi, Powers, Mooney, and Kamins, Judges.

AOYAGI, J.

Reversed.

Aoyagi, J., filed the opinion of the court in which Ortega, DeHoog, James, Powers, Mooney, and Kamins, JJ., joined.

Lagesen, J., dissented and filed an opinion.

Tookey, J., dissented and filed an opinion in which Egan, C. J., and Armstrong, DeVore, and Shorr, JJ., joined.

**AOYAGI, J.**

This is an appeal of a judgment modifying child custody. When J was an infant, mother was awarded sole legal custody of her, in a custody order attendant to the parties' marital dissolution judgment. When J was eight years old, the trial court changed legal custody from mother to father, after determining that there had been a substantial and unanticipated change of circumstances. Mother appeals the modification judgment, arguing that the facts are legally insufficient to establish a change of circumstances for purposes of custody modification. We agree with mother and, accordingly, reverse.

## I.   GENERAL PRINCIPLES

In making an initial custody determination, the trial court's focus is entirely on the child's best interests. *See* ORS 107.137. The court must assess the six statutory factors in ORS 107.137 to decide which parent it will be in the child's best interest to award custody to. *Id.* In this case, when J was an infant, the trial court necessarily found that it was in J's best interest for mother to have custody of her. Since that time, mother has had sole legal custody of J, while father has had significant parenting time.

Once a court has entered a custody order, the law favors custodial stability for the child. Toward that end, a court may not modify an existing custody order unless the parent seeking a change of custody proves a "change of circumstances." *State ex rel Johnson v. Bail*, 325 Or 392, 396, 938 P2d 209 (1997). "The requirement that there be a change in circumstances before a court will consider modifying custody is a rule of long standing" that was first discussed in case law over a hundred years ago. *Id*. at 397. As explained in *Merges v. Merges*, 94 Or 246, 254, 186 P 36 (1919), a final custody order "can be changed or superseded only by a showing that for some reason the [custodial parent] is not competent to care for the child or that some condition has arisen rendering [the child's] further care and custody by the [custodial parent] inimical to the child's welfare."

"The change of circumstances rule is designed primarily to avoid repeated litigation over custody and to

provide a stable environment for children." *Ortiz and Ortiz*, 310 Or 644, 649, 801 P2d 767 (1990). If the custodial parent remains fit to care for the child, it is "best under the circumstances to let well enough alone until new conditions intervene to disturb the status established by that decree." *Merges*, 94 Or at 257-58 (stating that, if father "was fit then to have the care of the child, he is fit now").

Thus, only after a qualifying change of circumstance has been proved may a trial court consider disrupting an existing custody order. It is a "two-step inquiry." *Johnson*, 325 Or at 397. First, the moving parent must show that, since entry of the most recent custody order, "circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed." *Boldt and Boldt*, 344 Or 1, 9, 176 P3d 388, *cert den*, 555 US 814 (2008). The change must be both unanticipated and material to the child's welfare. *Teel-King and King*, 149 Or App 426, 429-30, 944 P2d 323 (1997), *rev den*, 327 Or 82 (1998). If a change of circumstances is proved, then, second, the court must consider the change of circumstances "in the context of all relevant evidence" to determine whether changing custody to the moving party would be in the child's best interests. *Buxton v. Storm*, 236 Or App 578, 592, 238 P3d 30 (2010), *rev den*, 349 Or 654 (2011). It is at the second step that the court reassesses the six factors in ORS 107.137.

Since *Merges*, we and the Supreme Court have used varying language to describe the legal standard at the first step. It is often described as requiring a material (or substantial) and unanticipated change of circumstances relevant to "the capacity of either the moving party or the legal custodian to take care of the child." *Boldt*, 344 Or at 9; *see also, e.g., Botofan-Miller and Miller*, 365 Or 504, 520, 446 P3d 1280 (2019), *cert den*, ___ US ___, 141 S Ct 134 (2020) (same); *Johnson*, 325 Or at 397 (same).[1] Or, it is described

---

[1] A qualifying change of circumstances theoretically could involve the capacity of either parent to take care of the child, *see Boldt*, 344 Or at 9, but it typically involves the custodial parent's capacity. *E.g., Botofan-Miller*, 365 Or at 520-21; *see also Teel-King*, 149 Or App at 430 ("A showing that the noncustodial parent's circumstances have improved is not enough" to establish a change of circumstances.).

as requiring a material (or substantial) and unanticipated change of circumstances that has "injuriously affected the child" or, referring back to some language from *Merges*, has affected the custodial parent's "ability or inclination to care for the child in the best possible manner." *E.g.*, *Botofan-Miller*, 365 Or at 520-21 ("That is, a new development may be considered a legally sufficient change in circumstances only if it is shown that the change has 'injuriously affected the child' or affected the custodial parent's 'ability or inclination to care for the child in the best possible manner.'" (Quoting *Boldt*, 344 Or at 9.)).

Because the latter formulation of the legal standard could be misunderstood if read out of context, we pause to clarify what is meant by a change of circumstances that has affected the custodial parent's "ability or inclination to care for the child in the best possible manner." As is apparent from *Merges*, the source of that language, it does not refer to a general analysis of the child's "best interests" to determine which parent will "best" care for the child. *See Merges*, 94 Or at 254. Indeed, if deciding whether a change of circumstances had occurred entailed the same analysis as the "best interests" inquiry, then the modification analysis would involve only one step, rather than two, *Johnson*, 325 Or at 397, and would be no different than deciding initial custody.

In considering whether an asserted change of circumstances has affected the custodial parent's "ability or inclination to care for the child in the best possible manner," *Boldt*, 344 Or at 9, it is therefore important to keep in mind the fundamental standard for a change of circumstances—that the custodial parent is no longer "competent to care for the child" or that some condition has arisen that renders the child's continued care and custody by the custodial parent to be "inimical to the child's welfare," *Merges*, 94 Or at 254—as well as the primary purpose of the requirement—"to avoid repeated litigation over custody and to provide a stable environment for children," *Ortiz*, 310 Or at 649. Doing so, it is readily apparent that the task of the court is not to decide what *it* believes is the "best" parenting choice. That is, on a motion to modify custody, where two parents disagree about what is best for a child, on issues about which reasonable

minds can disagree, it is not the court's role to decide with which parent it agrees. Rather, the court is to assess the custodial parent's *ability* and *inclination* to care for the child in the best possible manner, even if the other parent or the court might favor a different parenting approach, so long as the child is not being "injuriously affected" by the custodial parent's parenting choices.

Finally, "'the amount of change necessary to justify a modification of a decree varies with the facts of the individual case.'" *Botofan-Miller*, 365 Or at 521 (quoting *Gonyea v. Gonyea*, 232 Or 367, 372, 375 P2d 808 (1962)). The facts must be legally sufficient to establish a change of circumstances, however, and existing case law illustrates the legal standard. For example, when the asserted change of circumstances involves "events of inadequate care and supervision," they "must be of such a nature or number reflecting a course of conduct or pattern that has had or threatens to have a discernable adverse effect upon the child." *Buxton*, 236 Or App at 592 (internal quotation marks and brackets omitted).

In *Colson and Peil*, 183 Or App 12, 22-24, 51 P3d 607 (2002), the evidence was insufficient to establish a change of circumstances, where the mother had allowed the child, who had a learning disability and was distraught about his parents' divorce, to miss a quarter of the school year and planned to move to Missouri even though the child did not want to move. By contrast, in *Garrett and Garrett*, 210 Or App 669, 672-74, 152 P3d 993 (2007), the evidence was sufficient to establish a change of circumstances, where the father had engaged in a pattern of interference with the children's relationship with the mother, by interfering with her parenting time and engaging in verbal altercations and at least one physical altercation. The evidence also was sufficient to establish a change of circumstances in *Botofan-Miller*. In that case, over time, the mother's anxiety and mental health issues had rendered her unable to make timely medical decisions for the child, which led to the child not receiving vaccinations on time and, worse, suffering medical consequences from an eye problem that could have led to permanent double vision but for the father forcing the issue of surgery. 365 Or at 508-09. The mother also

had developed an unhealthy "anxious attachment parenting style" that was pervasive in nature and was having significant detrimental effects on the child. *Id.* at 509-11.

## II.   FACTS

With those basic principles in mind, we turn to the facts of this case. Mother requests *de novo* review, but such review is discretionary, and we are unpersuaded to provide it here. *See* ORS 19.415(3)(b) (granting us "sole discretion" whether to allow *de novo* review in equitable proceedings); ORAP 5.40(8)(c) (limiting *de novo* review to "exceptional cases"). We are therefore bound by the trial court's express and implied factual findings, if there is evidence in the record to support them, and we state the facts and reasonable inferences therefrom in the light most favorable to the trial court's disposition. *Botofan-Miller*, 365 Or at 505. We infer an implied finding "where we can deduce that the trial court's chain of reasoning must necessarily have included" it. *State v. Lunacolorado*, 238 Or App 691, 696, 243 P3d 125 (2010), *rev den*, 350 Or 530 (2011).

The parties' daughter, J, was born in October 2009, shortly after dissolution of the parties' marriage. In a 2010 judgment, mother was granted sole legal custody of J, with father receiving parenting time. As of early 2017, J was spending about one-third of school months with father, alternating holidays with each parent, and spending half of the summer with each parent. Mother operates an in-home daycare, and father is a teacher.

In May 2017, when J was seven years old and finishing first grade, father moved to modify custody, parenting time, and child support. He asked to be designated as J's "residential parent," sought to limit mother's parenting time during the school year but to continue splitting equally holidays and summers, and requested a concomitant modification of child support. In his attached affidavit, father explained that he wanted a formal schedule, because the parties had been following an informal parenting time agreement that differed from the court order. Father described his "bigger concern," however, as being whether mother was currently providing a safe and stable home for J. He listed various concerns about mother's home, beginning with his

concern that mother might be living with an "abusive partner," Egle, who had "hit [J] with a belt." Father's other stated concerns related to school attendance, homework, household moves, scary movies, medical care, booster-seat usage, and the fit of J's clothing.

The court held a hearing on father's motion in January 2018, at which time J was eight years old and halfway through second grade. Father called four witnesses—himself, his wife, J's first-grade teacher, and a Department of Human Services (DHS) worker—and mother called five witnesses—herself, Egle, J, and two friends. Most of the testimony was uncontested. To avoid repetition, we discuss the specific testimony and findings in the analysis section. At present, it suffices to say that the issues that received the most attention included a statement that J had made about Egle spanking her with a belt, J's school attendance and timely arrival at school, mother's and father's differing views about homework, and J's medical and dental care.

Notably, father framed his arguments to the trial court mostly in terms of J's best interests. As to the change-of-circumstances requirement, father briefly addressed it in his trial memorandum, citing various life events that had occurred since the initial custody order, including moves, father's remarriage, and J starting school, and expressing concern that mother's new partner, Egle, may be "physically abusive" to J or "emotionally and verbally demeaning" to J. Otherwise, father focused on the best-interest factors. At the hearing, father described the change-of-circumstances requirement as his first hurdle but not a big hurdle, because, since the entry of the custody order, father had moved to Bend, gotten married, and had another child; mother had moved to Bend, started a business, gotten engaged, and had another child; and J had started school. Given those life events, father argued, "the situation now compared to when the last order was entered is completely different," and everyone "has changed their positions, including [J]," so "there's clearly a change in circumstances."

At the end of the hearing, the trial court announced its findings and conclusions. The court first addressed the change-of-circumstances requirement, concluding that there

had "been a substantial unanticipated change in circum-stances" in the eight years since the original custody judg-ment was entered. The court recognized that the change had to relate to mother's "capacity to provide care for the child," not just "random circumstances that changed," but concluded that standard was met, stating:

> "[W]hile it may have been appropriate to have [mother] be the sole legal custodian of [J] when she was an infant, I find there have been significant changes in circumstances since that time to today's date based on all of the facts in the record at this time *with respect to her becoming school age, her participation in school, behaviors in the home, con-cerns about behaviors in the home, people living in each of her homes, and of course, most recently, this disclosure about this alleged incident with a belt occurring with Mr. Egle.* And that all relates to Mother's capacity to remain as a custodial decision maker for the child, and so I find there has been a substantial change in circumstances, and I will be reaching that issue."

(Emphasis added.) The court focused especially on mother's handling of J's belt allegation, stating that "really many of the issues that are going to be dispositive in this case hover around each parent's dealing with" that allegation.

The court then proceeded to a "best interests" analysis under ORS 107.137, discussing each of the six stat-utory factors. The court concluded that four factors—J's emotional ties with other family members, the desirability of continuing an existing relationship, primary caregiver sta-tus, and willingness to facilitate and encourage the child's relationship with the other parent—were neutral and did not favor either parent. One factor—one parent's abuse of the other—was not applicable. That left a single factor—the parties' interest in and attitude toward the child—which the court discussed at length and ultimately found to favor father. The court cited mother's handling of J's allegation that Egle had spanked her with a belt as a "huge basis" for its decision, even if Egle had not actually spanked J with a belt. As the only factor that favored either parent, the interest-and-attitude factor was dispositive, and the court changed legal custody to father. As for parenting time, the court gave mother parenting time every other weekend (from

Wednesday afternoon to Monday morning) during the school year and ordered that J would spend alternating holidays and half of summer and winter breaks with each parent.

## III.   ANALYSIS

As previously discussed, ruling on a motion to modify child custody involves two separate analytical steps, with the first being the change-of-circumstances determination and the second being the best-interests determination. As to the first step, whether a particular set of facts is sufficient to establish a change of circumstances is a question of law. *Slaughter and Harris*, 292 Or App 687, 688, 425 P3d 770 (2018). A trial court may refer to having "found" a change of circumstances, and we and the Supreme Court may use various terms for the determination. *E.g.*, *Botofan-Miller*, 365 Or at 505, 520, 522 n 6, 524-25 (variously referring to the trial court's change-of-circumstances determination as a "finding," "ruling," "determination," and "conclusion"). Ultimately, however, whether the facts are sufficient to establish a "change of circumstances" is a legal question reviewed for legal error. *Slaughter*, 292 Or App at 688.

The burden of showing a change in circumstances rests on the parent seeking a change of custody. *Johnson*, 325 Or at 397. If the moving parent fails to prove a change of circumstances, the analysis ends, without reaching the best-interests inquiry. *Boldt*, 344 Or at 9 ("When there is insufficient evidence of a change in circumstances since the last custody determination, a court does not consider the second step of the analysis."). In this case, mother challenges both steps of the trial court's analysis, but, because we determine the first to be dispositive, we need not address the second.[2]

---

[2] In her second assignment of error, mother contends that the trial court erred in its best-interests analysis by failing to give mother the benefit of the statutory preference for the primary caregiver. *See* ORS 107.137(1)(e) (requiring the court to give a "preference for the primary caregiver of the child, if the caregiver is deemed fit by the court"). The court expressly recognized that J had "lived primarily with [mother]," that mother had been J's "primary placement," and that making father her primary placement would be a "significant change." However, the court declined to give any preference to mother, stating that, legally, both parents "are qualified primary caregivers." Given our disposition, we need not reach that issue. We note, however, that it is the subject of Judge Lagesen's dissent. *See* 309 Or App at 705-06 (Lagesen, J., dissenting) (opining that the trial court erred by failing to give the statutory preference to one of J's parents).

A.   *The Trial Court's Change-of-Circumstances Ruling*

Our review task in this case is complicated by how the change-of-circumstances issue evolved below. In the trial court, father relied largely on normal life events such as moves, remarriages, the birth of half-siblings, and J starting school as sufficient to establish a change of circumstances. The trial court implicitly—and properly—rejected that position. *See, e.g.*, *Dillard and Dillard*, 179 Or App 24, 32, 39 P3d 230, *rev den*, 334 Or 491 (2002) ("Normal developmental changes *** are not unanticipated changes *** and so cannot, in themselves, provide the basis for a change in circumstances."); *Teel-King*, 149 Or App at 430 (the child starting kindergarten was not a proper consideration in change-of-circumstances analysis). Beyond nonqualifying life events, the only change of circumstance identified as such by father was Egle's possible "abuse" or mistreatment of J. As discussed later, the trial court did not find any abuse or mistreatment to have occurred—yet it still found a change of circumstances, citing "all of the facts" regarding "[J] becoming school age, her participation in school, behaviors in the home, concerns about behaviors in the home, people living in each of her homes, and of course, most recently, this disclosure about this alleged incident with a belt occurring with Mr. Egle." The court then proceeded to a best-interests analysis under ORS 107.137.

That approach is problematic for purposes of appellate review, in that the trial court somewhat collapsed the two steps of the analysis, such that we must try to discern which evidence it considered relevant to a change of circumstances and which evidence it considered relevant only to the statutory best-interests analysis. *Cf. Buxton*, 236 Or App at 592-93 (clearly delineating between the change-of-circumstances and best-interests analyses, including identifying the evidence relevant to each). Erring on the side of caution—that is, taking the broadest view possible—we understand the court to have relied on three sets of facts as establishing a material and unexpected change of circumstance: (1) school-related issues, particularly regarding homework, tardies, and attendance; (2) mother's occasional use of physical discipline; and (3) mother's handling of an

allegation that Egle had spanked J with a belt. We discuss those issues in detail in the following sections.

Before doing so, we briefly address the only other issue that father identifies on appeal as relevant to a change of circumstances, which is his allegation below that mother has neglected J's medical and dental care.[3] We disagree that that issue is relevant to our review of the change-of-circumstances determination. The trial court expressly found against father on the issue of medical care, stating that father not knowing about J's doctor's visits did not persuade the court that there was a problem with J's medical care, and finding no evidence that J "suffered any serious illnesses or injuries that weren't attended to." As for J's dental care, it was uncontested that J has generally received appropriate dental care, and the only finding adverse to mother was that, in summer 2017, mother delayed having three cavities filled, which, although there was no evidence of any adverse effect on J's teeth, the court viewed as "not in the child's best interest."[4] It is apparent from the record that the court did not consider that incident relevant to a change of circumstances—and correctly so. *See Buxton*, 236 Or App at 592 (inadequate care rises to the level of a change of circumstances when there is a "a course of conduct or pattern that has had or threatens to have a discernable adverse effect upon the child" (brackets omitted)). We therefore do not discuss J's medical or dental care further.

B.  *School-Related Issues*

The first change of circumstance identified by the trial court involves J "becoming school age" and "her participation in school." Given the generality of that statement, we assume that the trial court meant to refer to all evidence related to J's schooling. The evidence about J's schooling

---

[3] As for other "concerns" mentioned in father's motion that are not discussed herein, little evidence was admitted on them, the trial court implicitly rejected or did not address them, and father does not rely on them on appeal.

[4] Since 2015, by agreement of the parties, J has gone to the dentist's office where father's wife works as a dental assistant. Around the time that father filed his motion to modify custody, mother cancelled a dental cleaning and checkup scheduled for June 27, 2017. Father's wife later did an informal examination of J's teeth and discovered three cavities. Everyone agrees that those cavities were filled sometime in August 2017.

generally fell into three categories: absences from school, tardies, and homework.

As a preliminary matter, we note that it is uncontested that J is doing well in school. According to her first-grade teacher—whose testimony the trial court expressly credited—J "does wonderfully in school," and the lack of homework has not affected her academically. The only other person to testify about J's school performance was mother, who described J as "doing great," "above in reading," "well-liked by her peers and her teacher," and reported at school conferences as being "at grade level or above."

Regarding absences, while living with mother, J missed nine days of school in kindergarten, 13 days of school in first grade, and seven days of school in the first half of second grade. It was uncontested that most of those absences were due to J being sick. However, once, mother let J stay home for a "mommy-daughter day," when J was stressed about her math class. Also, there was evidence that, on one occasion, father had asked mother why J had missed two days of school, and mother responded that mother was not feeling well and had homeschooled J on those days. The court's only finding about J's school absences related to the latter incident, with the court inferring that mother had kept J home to help mother while mother was sick, which it viewed negatively. Mother challenges that finding as impermissibly speculative, but, because it pertains to only two school days, we need not address whether such an inference was reasonable.

Regarding tardiness, J was late to school 27 times during first grade while staying with mother. Because of her daycare obligations, mother had arranged for someone to drive J to school in the mornings. J was always ready and out the door on time, but, unbeknownst to mother, J often arrived late to school because of health-related issues with her driver, who was pregnant with twins. When mother learned how many tardies that J had, she was "shocked" and arranged for a different person to drive J to school. There has been no tardiness issue in second grade. The trial court found that mother "didn't know about" the tardies, but it expressed the view that mother should have taken

affirmative steps to confirm whether J was arriving on time and stated that it was "not in J's best interest" to be tardy so often.[5]

Regarding J's homework, father and mother have different views on it. Homework is optional at J's school as a matter of school policy, which fact is communicated to the parents in a letter at the beginning of the school year. Father believes that homework is good for young children and a "value" to them, and he has J do homework every night at his house. In mother's view, it is better for young children not to do homework and to focus instead on family time, and she has found support for that view in talking to friends and doing research online. Mother has J do homework only when J wants to do it and is in a good mood about it.

J's first-grade teacher testified that all homework is optional, that she told mother that it was "fine" for J not to do homework, and that not doing homework did not affect J academically. The teacher herself favors children doing homework and felt that J "wanted" to do homework and "cared about getting homework done" as a "value" of hers. There is no evidence that the teacher communicated that perception to mother, however, or that she gave mandatory homework in contravention of the school policy. To the contrary, the teacher expressly testified that she told mother it was fine for J not to do homework.[6] As for J herself, she testified briefly about homework, in response to questions from the court, stating that homework is optional and that she sometimes does it and sometimes does not. J noted that, in second grade, if you do homework, you get a sucker from the sweet treat box on Friday. The court asked J is she likes the sweet treat box, and J answered, "Uh huh."

---

[5] There was also evidence that mother sometimes pulled J out of school early, but that evidence was minimal, and the trial court referred in its findings only to a single incident in which mother did not return J to school in the afternoon, after taking her out for an appointment, because mother needed to get back to the daycare.

[6] As the dissent notes, the trial court "found that mother disregarded J's teacher's request" that homework and reading logs be done. 309 Or App at 719, 732 (Tookey, J., dissenting). To the extent that finding has any support in the record, it has minimal relevance, given the teacher's own testimony—which the trial court credited—about what the teacher told mother and about J's performance in school.

The trial court found that the first-grade teacher was credible "about [J] showing up and not having done her homework [and feeling] badly" and that "it is her mother's choice that that occurs." The trial court also found that J "really likes to get a treat" on Fridays for doing homework and feels badly when she does not get a treat, stating that it "is not in a child's best interest to have those feelings occur in the classroom."[7] The court found that J "was not being supported in her math skills," because mother did not have J do homework, and "was not being supported in filling out a reading log," stating—apparently based on the court's own view of reading logs—that filling out a reading log "establishes regularity and consistency for a child."

We agree with mother that the school-related issues found by the trial court do not rise to the level of a material and unanticipated change of circumstances allowing a change of legal custody. There was certainly evidence of a tardiness problem in the first grade. However, the trial court found that mother did not know that J was arriving late to school, and it was undisputed that mother arranged for a different driver when she learned of the issue and that there has been no tardiness issue in second grade. On that record, the court could not find a change of circumstances based on school tardiness. As for J missing two or three days of school for reasons other than J being sick and mother not returning J to school after an afternoon appointment, such sporadic events do not establish a change of circumstances, let alone when they have had no discernable adverse effect. *See Buxton*, 236 Or App at 592 (requiring a "course of conduct or pattern that has had or threatens to have a discernable adverse effect upon the child" (brackets omitted)).

As for homework, a difference of opinion between two parents as to whether a young child should do optional homework or instead spend time with family is not a material

---

[7] The only evidence regarding the sweet treat box is that described in the text. Because there was no evidence as to how often J gets a treat—relative to her classmates or otherwise—or how she feels when she does not get a treat, we agree with mother that the court's finding that J is suffering some harm from not getting a sucker every Friday was impermissibly speculative. *See Aguilar v. Badger*, 304 Or App 769, 770, 469 P3d 279 (2020) (findings must be based on "inferences that *reasonably* may be drawn" from the evidence to be binding on appeal (emphasis added)).

and unanticipated change of circumstances. Instead, it is precisely the type of difference of opinion that divorced parents are allowed to have. Harking back to our discussion of the applicable standard, *see* 309 Or App at 685-87, it was not the trial court's role to decide whether *it* believes that children should do optional homework or fill out reading logs as the "best" parenting choice. Father may believe that young children should do homework every night, and J's first-grade teacher, who shares that view, may have perceived that J would have preferred to do homework every night. But reasonable minds can disagree about the benefits of homework for young children, and it is undisputed that J is doing well in school. Indeed, the very fact that the homework is optional *as a matter of school policy* evinces the changing societal views on homework for young children and the fact that reasonable minds can disagree about whether and how often it should be done. As long as mother was trying to care for J in the best possible manner and was not causing injury to J, the fact that J's parents disagree about the benefits of optional homework did not constitute a change of circumstances.

## C. *Mother's Occasional Use of Physical Discipline*

The next issue that the trial court may have considered relevant to a change of circumstances is mother's occasional use of physical discipline. It is not entirely clear that the trial court did so. It may have considered it relevant only to the best-interests analysis. However, because we are unable to discern anything else that the court could have meant by "behaviors in the home, concerns about behaviors in the home," we assume that the court was referring to mother's occasional use of physical discipline.

The only evidence on that issue came directly or indirectly from mother's own statements. Mother testified to using occasional physical discipline. Specifically, she testified that she has spanked J about five times in her life—meaning a "swat on the butt" designed to get her attention but not to hurt her—and has swatted J on the mouth "two times ever," when J was yelling very rudely, which swats were only hard enough to get J's attention, did not leave a mark, and did not involve "strik[ing]" J's face. The last time

that she swatted J on the mouth was about two years before the hearing. Mother testified that, when the DHS caseworker asked her about physical discipline, she made statements consistent with the foregoing. The DHS caseworker testified similarly. Although father did not make any arguments about mother's use of physical discipline, he also testified that mother "has said" that she "smacks" J's face and "spanks" her.[8]

On that record, the trial court commented disapprovingly on mother's swatting of J's face two years earlier when J was six years old, stating that, if mother found a six-year-old rude, she would find a teenager even ruder. We express no opinion as to when it is permissible to consider the occasional use of physical discipline as weighing against a parent in a best-interests analysis. We limit our discussion only to the relevance of the evidence in this case to a change of circumstances. Here, there was no evidence that mother had ever used unlawful physical discipline or injured J in any way. Reasonable parents can disagree about the occasional use of physical discipline. It is unclear that the trial court considered mother's occasional use of physical discipline to be a change of circumstances, but, if it did, it was error on this record.

## D.   *Mother's Handling of the Belt Allegation*

The final change of circumstance identified by the trial court was "people living in each of [J's] homes, and of course, most recently, this disclosure about this alleged incident with a belt occurring with Mr. Egle." Other than Egle, there was no evidence of J having any potential issue with anyone living in either home—it is undisputed that J is close to both her parents, gets along with father's wife, and is close to her younger half-sister by father, her younger half-sister by mother, and Egle's young daughter. Thus, both of the foregoing references by the trial court must be to Egle.

---

[8] The only other evidence potentially connected to mother's use of physical discipline was testimony by the DHS caseworker that, when she went to father's house, father said that J "had presented at his house with what looked to be a swollen lip," but she examined J and did not see a swollen lip. Father did not testify about a swollen lip.

The evidence regarding Egle was generally uncontested. Mother and Egle dated on and off for several years and got engaged in December 2017. Egle has a young daughter as to whom he has parenting time. Egle lived in mother's home for part of 2015 and early 2016, moved out from March 2016 to November 2017, and then moved back into mother's home. The reason that Egle was out of the home for a period was because he had a pending criminal case that could affect mother's daycare license. Specifically, in 2015 or early 2016, Egle pleaded guilty to one count of misdemeanor assault, based on an altercation with an ex-girlfriend, and was placed in a diversion program because he had no prior criminal history. The charge was pending dismissal at the time of the modification hearing. Egle maintained his innocence to mother, and mother believed his version of events over Egle's ex-girlfriend's. Egle had been allowed to continue unsupervised parenting time with his daughter throughout the case, but he had to move out of mother's home for a period to avoid interfering with her daycare license.

There was minimal evidence regarding J's relationship with Egle. Mother testified that J was initially reluctant to accept Egle but had since developed a great relationship with him. Egle also testified to a positive relationship with J, and he specifically denied ever using any physical discipline with J or any child. Two family friends who have observed Egle with J testified to their having a positive relationship. No one testified to witnessing any negative interaction between Egle and J.

In March 2017, however, when J was seven, J's paternal grandfather said during a family conversation that he had once spanked father with a belt when father was a child, at which point, according to father, J "made the comment that [Egle] had spanked her with a belt." The room went silent, and, thereafter, father called DHS. A DHS caseworker and a police officer arrived at father's home. According to the caseworker, J repeated what she had said, did not appear upset, and was generally relaxed, happy, and talkative. The caseworker and police officer then went to mother's home. Mother was "alarmed" to find them at the door, which the caseworker described as "natural," and, because daycare children were present, they scheduled

a time to return. The caseworker did not testify to having any substantive conversation with mother at that time. However, according to mother, after the police officer reassured her that "this kind of thing happens all the time" and would likely be dropped, the DHS caseworker aggressively insisted that J was telling the truth, to which mother responded that that was the caseworker's opinion but that she (mother) had not yet talked to J (who was still at father's house), that J sometimes lies or exaggerates, and that mother's initial feeling in her "heart of hearts" was that it had not happened. When asked by the court about "denying" the allegation before talking to J, mother explained that she had not "denied" it and always intended to talk to J but was expressing her initial reaction from knowing Egle and J and what happens in her home.

Mother talked to J before the DHS caseworker returned for the scheduled interview. According to mother, she asked J to tell her exactly what had happened, and J was very apologetic and led mother to believe that Egle had not actually spanked J with a belt. Around that time, mother emailed J's teacher about what had happened and set up an appointment for J with the school counselor.[9]

According to the DHS caseworker, when she returned to interview mother, J was present, and it was "extremely tense." Mother demanded that J tell the caseworker that she had lied. In response, J hung her head and would not answer, and, when mother insisted that she speak to the caseworker, J was quiet for about 15 seconds and seemed "scared." When J eventually spoke, she said in "two full sentences" that she had lied because she didn't want her mom to get married. The caseworker thought that the way that J said it did not seem developmentally appropriate, so she told mother that she thought that J had been "coached and scripted." Either at that point or sometime later, mother said, in front of J, that J "exaggerates" and "lies" about things. The caseworker was extremely concerned for J's "emotional safety," so she

---

[9] In the same time period, J told her teacher that Egle had "threatened" to hit her with a belt, prompting the teacher to call DHS, but that hearsay statement was admitted only for its effect on the listener and not for the truth of the matter asserted. It therefore cannot be cited for the underlying "fact." *See* 309 Or App at 708, 711, 722 n 9, 726 (Tookey, J., dissenting).

cut the visit short. (The caseworker did not explain in her testimony what she meant by "emotional safety" or otherwise expound on that point.) The caseworker concluded that, if any spanking by Egle had occurred, it "would not have been out of control" because there was apparently no injury, so she closed the case as unfounded for physical abuse.[10]

J also testified about the belt allegation. The trial court had an extended colloquy with J about the importance of telling the truth in court, and J promised to tell the truth. J then testified as follows. J did say that Egle had spanked her with a belt, but he did not really do it. What happened was that J was at a pizza restaurant with father, father's wife, and J's paternal grandparents, and "they were talking about how in their childhood they got spanked with a belt." J wanted to join in, so she said that Egle had spanked her with a belt too. J "didn't know it was going to * * * go into a big thing." She repeated what she had said to the DHS caseworker and the police officer, but it "didn't really happen" and was not true. J felt "crummy" about it, because she should not have done it. She has never told father the truth, because she has "been scared" about what he might do and was "like nervous to tell him." Father thought that J was mad about having to go back to mother's house, because he thought it really happened, but J "was actually mad because [she] lied," including to a police officer, and was "worried because [she] didn't want to get in trouble for lying and then [her] mom would know."

The trial court was unpersuaded that Egle had actually spanked J with a belt. The court described J as "very intelligent" and "quite lovely" and did not expressly find that J had lied about Egle spanking her with a belt. However, the court was "not particularly convinced" as to how the statement came about or why J made it, was "not sure that [J] disclosed because it actually happened," and viewed it as "suspicious" and "strange" that J "shared an experience that was similar to what the grandfather was talking about." The trial court speculated that J may have

---

[10] The trial court found the DHS caseworker to be generally credible, noting that the caseworker and J's first-grade teacher had "no bias or motive in testifying," whereas the parents and family members in family law cases "always have skin in the game."

lied about Egle spanking her with a belt because she was "seeking attention," wanting "to be heard about something," or reacting to "some upheaval" at home. Nonetheless, even if J had lied, the court had "great concerns" about mother's reaction to the situation, which the court described as being "not to support and protect her child and figure out what's going on for her kiddo" but "to defend her fiancé," call her child a liar, and call J to testify. At the very end of the hearing, the court returned to the belt issue, reiterating that it was "not convinced" that J had actually been spanked with a belt and expressing hope that J would learn to "self-regulate and not seek out whatever attention she's seeking out."

Having not been persuaded that Egle actually spanked J with a belt, the trial court erred in treating mother's reaction to the belt allegation as itself a substantial and unanticipated change of circumstances permitting a change of legal custody. The court was particularly critical of mother's initial reaction, when DHS and the police showed up at her door, but mother's testimony was the only evidence about her initial reaction, and we do not see how that testimony can be construed as mother failing to "support and protect" J or inappropriately "defending" Egle. As for mother's formal interview with DHS, it occurred *after* mother talked to J and concluded that J had lied. Such a lie could have significant consequences. In that context, if J *had* lied, pressing J to tell the truth and saying in front of J that J "lies" or is a "liar" might not have been the most sensitive way to handle the situation—certainly the caseworker was concerned about an "emotional" effect on J—but it is hardly evidence that mother is no longer competent to care for J or is generally inconsiderate of J's feelings. This was a single interview, under stressful circumstances, and mother believed that J had told a lie with potentially serious consequences. The trial court described mother's reaction as creating a "culture of silence and recantation," but the only evidence is that mother insisted that J talk, not be silent, and wanted J to recant a lie, not the truth.

Relatedly, the trial court assigned significance to the fact that J was happy and carefree at father's house, when she repeated to DHS what she had said earlier about being spanked with a belt, but was quiet and scared on a later

date at mother's house, when mother was pressing her to tell DHS that she had lied. Importantly, there was no evidence that J acted differently in mother's and father's homes *in general*—only during this one pair of DHS interviews regarding a very specific allegation. But, if J had in fact lied about Egle spanking her with a belt, the difference in her demeanor between father's house—when J did not realize that what she had said would become "a big thing" (in J's words)—and the DHS interview at mother's house—by which time the significance was apparent and J was worried about getting in trouble for lying—is unremarkable. To put it simply, there is a vast difference between a child feeling distress that her mother is pressing her to tell a lie to a DHS employee and a child feeling distress that her mother caught her in a lie and is pressing her to tell the truth to a DHS employee.

To summarize, father failed to prove that Egle had ever spanked J with a belt, let alone that Egle was "abusive" to J, which was the concern that father raised in his motion and trial memorandum. There was no evidence that Egle was physically or emotionally "abusive" to J, except for J's singular (recanted) statement that Egle had spanked her with a belt, which the trial court was unpersuaded had actually happened. Yet the court evaluated mother's handling of the belt allegation as if Egle *had* spanked J with a belt and mother refused to believe her. At the same time, the court deemed mother a fit parent and gave her substantial parenting time, suggesting that it had no serious concern about J's physical and emotional safety in mother's home. Indeed, in context, it appears that the court's parenting-time modifications were intended largely, if not entirely, to ensure that father would be the parent taking J to school in the mornings and supervising her homework.[11] Under the circumstances,

_____

[11] We note that, at one point in its ruling, the trial court commented that, although J was doing well in school and was "very intelligent" and "quite lovely," it was concerned that J was "incurring a substantial amount of distress" from the modification proceeding. The dissent treats the latter statement as a factual finding that a *change of circumstances* in mother's home was causing J substantial emotional distress. 309 Or App at 707, 716, 722 n 9, 728-29, 729-30 (Tookey, J., dissenting). We do not understand the court to have intended such a finding, nor would one be supported by the record, as there was no evidence of J experiencing any emotional distress except in a single DHS interview. The court made its "distress" comment in the context of telling the parties that J loved both of her parents, was worried about what was happening in the hearing, and wanted to be sure that both her parents were okay.

the trial court erred in concluding that mother's handling of a single incident—DHS's report to mother that J had said that Egle spanked her with a belt—was so inappropriate as to rise to the level of a material and unanticipated change of circumstances permitting a change of legal custody.[12]

Lastly, we comment briefly on the trial court's criticism of mother for calling J to testify at the modification hearing. There are certainly good reasons not to have children testify unnecessarily, especially in disputes between their parents. However, as the Supreme Court has recognized, "a child's testimony may be essential" to establish a disputed material fact. *Gonyea*, 232 Or at 375. In *Gonyea*, the court was critical of a child testifying where "there was no need" for it. *Id.* at 376. Here, father was asking the court to change custody of J, and his first claim was that Egle was "abusive" and had "hit [J] with a belt." That created a material factual dispute as to which *only* Egle and J had direct knowledge and about which the court was unlikely to take Egle's word without hearing from J. The trial court's criticism of mother for having J testify failed to take into account the specifics of this case.

## IV.   CONCLUSION

Taken individually or together, the evidence was insufficient to establish that mother is no longer competent to care for J or that a condition has arisen rendering J's further care and custody by mother inimical to J's welfare.

---

[12] At the risk of stating the obvious, throughout this opinion, we have described the hearing evidence consistent with our standard of review and disagree with any contrary suggestion by the dissent. *See* 309 Or App at 709, 722 n 9, 727 n 10 (Tookey, J., dissenting). One somewhat unique aspect of this case is that there was very little contested evidence. That is, there were very few instances of two people giving contradictory testimony on the same issue. Based on the trial court's findings, the court appears to have generally credited most of the testimony, except insofar as it indicated that, in family law cases, it always views the testimony of the parties and their friends and family members as somewhat biased due to their having "skin in the game," whereas it views witnesses like J's first-grade teacher and the DHS caseworker as inherently more objective. Although the trial court could have discredited some of the testimony that it heard, there is no indication that it discredited any particular testimony, and, under the circumstances, it is appropriate to simply describe the totality of the record on which the court made its decision. To the extent the court silently discredited any particular testimony, it would not change the result.

*Merges*, 94 Or at 254. As such, the court should have "let well enough alone," *id.* at 257-58, and not disturbed the existing custody order. To conclude otherwise would be to disregard the important purpose of the change-of-circumstances rule, which is "to avoid repeated litigation over custody and to provide a stable environment for children." *Ortiz*, 310 Or at 649.

This is not an initial custody determination. Father seeks to modify custody for an eight-year-old child who has been in mother's sole legal custody for her entire life. If the parties were divorcing now, the court would likely have the latitude to award legal custody to either parent. But that is not the situation. There is an existing custody order, which has been in place for many years, and it cannot be changed until and unless there has been a material and unanticipated change of circumstances in mother's capacity to care for J. *Botofan-Miller*, 365 Or at 520. Father failed to carry his burden of proof in that regard. Accepting the trial court's express and implied factual findings that are supported by any evidence in the record, the facts here are legally insufficient to establish an unanticipated and material change of circumstances allowing a change of legal custody. The trial court therefore erred in ordering a change of custody.

Reversed.

**LAGESEN, J.,** dissenting.

The majority opinion reverses outright the trial court's supplemental judgment changing custody to father based on its view that the evidence is not sufficient to demonstrate the type of material change in circumstances that allows a court to change child custody from one parent to another. For the reasons stated in Judge Tookey's dissenting opinion, with which I agree almost completely, the majority opinion is incorrect in that regard. But Judge Tookey's dissenting opinion is not, in my view, entirely correct itself. It concludes that mother failed to preserve her contention that the court erred when it did not determine which parent was A's primary caregiver entitled to the statutory primary caregiver preference under ORS 107.137(1)(e), so does not address that contention.

My perspective is different. The assigned error is preserved, at least as much as it has been in the other child-custody appeals I have seen. The parties in their written and oral submissions argued about who qualified as the primary caregiver entitled to the preference, placing at issue the question of who was entitled to the preference, and the court addressed the preference, albeit incorrectly.

That means that we should reverse and remand for the trial court to reconsider its decision after determining which parent is the primary caregiver and then accounting for the primary caregiver preference when making the best interest determination under ORS 107.137: "[T]he primary caregiver is afforded a statutory preference, and that preference must be properly considered." *Gomez and Gomez*, 261 Or App 636, 638, 323 P3d 537 (2014). We have done exactly that at least three times in matters difficult to distinguish from this one. *Wanting and Wanting*, 306 Or App 480, 484-85, 475 P3d 127 (2020) (vacating and remanding custody decision where trial court did not account for primary caregiver preference in its custody decision); *Gomez*, 261 Or App at 638 (reversing and remanding custody decision for reconsideration where trial court did not determine which parent was the primary caregiver and, consequently, did not account for the preference in its decision); *Nice v. Townley*, 248 Or App 616, 623, 274 P3d 227 (2012) (vacating and remanding custody decision based on failure to take into account primary caregiver preference). I would stay the course.

**TOOKEY, J.,** dissenting.

The disposition of this case turns on the proper application of the standard of review set forth in *Botofan-Miller and Miller*, 365 Or 504, 446 P3d 1280 (2019), *cert den*, ___ US ___, 141 S Ct 134 (2020), and on the substantive law as set forth therein. I respectfully dissent because I believe that the correct application of that standard of review and substantive law requires that we affirm the trial court.

In *Botofan-Miller*, the Supreme Court stressed that we are to give deference to trial courts: We are to uphold "the trial court's findings of facts if there is any evidence in the

record to support them," and we are to accept "reasonable inferences and reasonable credibility choices that the trial court could have made." *Id.* at 505-06. Further, "if the trial court failed to articulate its factual findings on a particular issue, we assume that the trial court decided the facts in a manner consistent with its ultimate conclusions, as long as there is evidence in the record, and inferences that reasonably may be drawn from that evidence, that would support its conclusion." *Id.* at 506.

Additionally, in *Botofan-Miller*, the Supreme Court reiterated what has long been the law in Oregon: "[T]here is 'no constant or standard quantity of change that will qualify' as a sufficient basis for a custody modification; rather, 'the amount of change necessary to justify a modification of a decree varies with the facts of the individual case.'" *Id.* at 521 (quoting *Gonyea v. Gonyea*, 232 Or 367, 372, 375 P2d 808 (1962)). That, of course, makes sense: Every child is unique, and some children are more resilient than others. A change that is adverse to one child's welfare might not be adverse to a different child's welfare. *See id.* at 520-21 ("[T]o justify a change in custody, a change of circumstances must be material. A material change is one that is adverse to [the] child's welfare." (Internal quotation marks and citation omitted.)).

This case is, at bottom, about an eight-year-old child whom the trial court was "very worried" about because, from the evidence presented, including the child's own testimony, and from the trial court's observations of the child in the courtroom, it was "very, very apparent" to the trial court that the child was "incurring a substantial amount of distress." The trial court was so concerned about the child that it expressly stated that, regardless of who would have custody, it would order that the child be evaluated for "mental health concerns" and would require completion of "any recommended treatment or aftercare."

Based on the record before it, the trial court found that there was "some upheaval" in the child's mother's home and that the child was "kind of an afterthought" and was "not prioritized" by her mother. Among other facts, the

record in this case reflects that since the last custody determination had been made, the child asserted that she had been hit with a belt by her mother's boyfriend and that her mother's boyfriend had threatened to hit her with a belt. Additionally, the record shows that the child had her mother's boyfriend move into her mother's house, then out of her mother's house, then back into her mother's house again; had her mother cancel a dentist appointment and not allow her father to schedule another one to have three cavities filled; had her mother keep her home from school when doing so suited her mother's needs; had frequently been tardy for school while in her mother's care; had her mother not allow her to do homework; had repeatedly been called a liar by her mother, including when she alleged that her mother's boyfriend had hit her with a belt; and, by her mother's own admission to a Department of Human Services caseworker, had "occasionally" been slapped in the face by her mother for being rude.

I agree with my colleagues in the majority on a couple of points: I agree that "on a motion to modify custody, where two parents disagree about what is best for a child, on issues about which reasonable minds can disagree, it is not the court's role to decide with which parent it agrees." 309 Or App at 686-87. And I agree that "the task of the court is not to decide what *it* believes is the 'best' parenting choice." *Id.* at 686 (emphasis in original). But that is simply not what occurred in this case.

In my view, the record in this case reflects that the trial court correctly understood what the law required of it and applied that law to the record before it in a permissible fashion: It assessed mother's "*ability* and *inclination* to care for the child in the best possible manner," *id.* at 687 (emphases in original), and determined that circumstances relevant to the capacity of mother to take care of the child properly had changed in a way that was adverse to the child's welfare. That is, it determined that the child was being "injuriously affected" by mother's parenting choices. *Id.* at 687. I emphasize that our task on appeal is not to second guess the trial court's determination when that determination is supported by the record.

In my view, given the record in this case and the trial court's ruling, *Botofan-Miller* requires that we affirm the trial court.[1]

## I.   BACKGROUND

As we have previously recognized, "The inquiry in child custody cases is fact intensive." *Bradburry and Bradburry*, 237 Or App 179, 181, 238 P3d 431 (2010) (so recognizing and providing "a detailed history of the parties' relationship with each other and with their children"). Because the majority and I take a different view of the relevant evidence and the trial court's ruling, prior to turning to what I believe is the proper analysis in this case, I provide my view of the factual record and the trial court's ruling, keeping in mind our standard of review, as set forth in *Botofan-Miller*.[2]

### A.   *General Background*

J was born in October 2009. In June 2010, when J was still an infant, mother was awarded custody of J, and father was provided with parenting time.

The custody modification hearing in this case occurred in January 2018, when J was eight years old and in second grade. At that time, during the school year, J spent approximately two-thirds of each month living with mother

---

[1] As described further below, the trial court in this case provided a detailed and thorough ruling. I disagree with the majority that the "approach" taken by the trial court in its ruling is "problematic for purposes of appellate review." 309 Or App at 692. In my view, the trial court's ruling is sufficient for the purposes of our review and, applying the standard of review set forth in *Botofan-Miller*, we are required to affirm the trial court.

[2] As noted, the majority and I read the record before us differently. That is, at least in my view, in part due to different understandings of how to apply the deferential standard of review set forth in *Botofan-Miller*. 365 Or at 505-06 (stating the standard of review). I believe that the majority, in its understanding of the facts and in its analysis, relies too heavily on testimony that the trial court could have disregarded given the reasonable credibility choices that the trial court could have made, the express credibility choices that the trial court did make, and the assumption that the trial court decided the facts in a manner consistent with its ultimate conclusion.

In this dissent, I do not undertake to highlight every area of disagreement with the majority. Instead, it largely suffices to recount the record as I believe we must understand it given the standard of review in *Botofan-Miller*. I do, however, note my disagreement where it relates to a few of the more salient points addressed by the majority.

and mother's partner, Egle, and spent approximately one-third of each month living with father and father's wife. During the summer break, J alternated between mother's home and father's home, spending half of summer break with each parent.

B.  *Egle's History of Domestic Violence*

In July 2015, Egle was involved in a physical altercation with a former domestic partner, M, in which M alleged that Egle had strangled her. As a result of that altercation, Egle pleaded guilty to fourth-degree assault and entered a diversion program, which included a requirement that Egle participate in a batterer's intervention program. At the time of the custody modification hearing in this case, the fourth-degree assault case against Egle was still pending, and mother was not sure of the status of Egle's case, though mother testified during the custody modification hearing that she believed that Egle had completed what was required of him to successfully complete diversion.

Additionally, during the custody modification hearing, mother testified that she did not believe that M was "truly a victim" of assault and did not believe that Egle engaged in the conduct to which he pleaded guilty regarding the assault on M. Mother testified that, instead, she believed the following version of events:

> "[Egle's] ex-girlfriend [M] showed up [at] his apartment, unlocked [the door] with her key, so he had locked the door. [M] invited herself in without notice, came there. They started arguing. [M] punched [Egle] in the face. And then [Egle] called 9-1-1. And then [M] ran away. [M] called 9-1-1, and then the cops got involved. And then [M] said that he tried to strangle her, which, according to what [Egle's] told me, and I believe him, he did not."

M obtained a restraining order against Egle under the Family Abuse Protection Act in 2015. The restraining order against Egle was renewed in 2016 and 2017, and was in effect at the time of custody modification hearing in this case. Mother was aware of the restraining order against Egle.

C.   *Egle's Relationship with Mother and J, J's Allegation that Egle Had Hit J with a Belt, and the Events that Followed from that Allegation*

Egle originally moved into mother's home with mother and J in October 2015—only a few months after Egle had engaged in the conduct that resulted in his pleading guilty to fourth-degree assault. Egle would, on occasion, get angry with J when J was "not behaving" or "disrespecting."

In March 2016, Egle moved out of mother's home, because the pending fourth-degree assault case against Egle would interfere with licensing for a daycare that mother planned to run in her home. After Egle moved out, mother opened the daycare.

In March 2017, when J was seven years old, and while J was in her father's care, J told her paternal grandparents and father's wife that Egle had hit her with a belt. Additionally, J reported to her first-grade teacher that Egle had threatened to hit her with a belt, which prompted her first-grade teacher to contact the Department of Human Services.

J also told Sandvigen—who is a child protective services caseworker with the Department of Human Services—father, and a police officer that Egle had hit her with a belt.

Given what J had said concerning Egle, a police officer and Sandvigen visited mother's home. J was not present at the time. And, although mother had not yet spoken with J about J's allegation that Egle had hit J with a belt, mother told the police officer and Sandvigen "this didn't happen" and that in her "heart of hearts" she did not think that Egle hit J with a belt. Mother also told the police officer and Sandvigen that J can exaggerate and lie. Similarly, mother sent emails to J's first-grade teacher, telling the teacher that J was dishonest, and that J had made the allegation concerning Egle because J did not want mother to marry Egle.

After the police officer and Sandvigen visited mother's home, mother spoke with J about J's allegation. Based on

J's statements to mother, mother determined that, in her opinion, Egle did not, in fact, hit J with a belt.

Shortly thereafter, Sandvigen again visited mother's home, and this time interviewed J. Sandvigen testified in the custody modification hearing and explained that, during her interview with J at mother's home, for which mother was present, mother called J a liar, demanded that J tell Sandvigen that she had lied, and directed J regarding "what to talk about and what to say." Additionally, Sandvigen testified that, during the interview, it appeared that J was scared, that J's answers had been coached or scripted, and that J's answers were not consistent with those of a seven-year-old. Further, Sandvigen testified that, while interviewing J, she became "extremely concerned" for J's emotional safety.

Sandvigen also visited J at father's home. Sandvigen testified that, in contrast to the visit at mother's home, at father's home, J was "[p]layful, relaxed, communicative, chatty, [and] friendly, like a typical seven-year-old." Sandvigen further testified that J was extremely relaxed and smiling at father's home and that she was able to speak with J outside of father's presence at father's home.

Ultimately, Sandvigen concluded that J's allegation about Egle was unfounded. Sandvigen testified that she reached that disposition because, to be a founded allegation, there must be "an injury, mark, or some kind of internal injury," and that that was not present on J.

In November 2017, Egle moved back into mother's home after mother determined that Egle living with her would no longer cause licensing issues for the daycare that mother was running in her home.

During the custody modification hearing, mother called J to testify. J testified that Egle did not hit her with a belt and that she had lied. J testified that she told the lie because her grandma, father, and stepmom "were talking about *** how in their childhood they got spanked with the belt" and J wanted to "join in."

Additionally, during the hearing, mother testified that J had told her that she had lied because she had "heard

the stories of the belt spanking" and "she just wanted to chime in."[3]

## D.  *Mother and Father's Disciplining of J*

Mother and father have different approaches to disciplining J. Father does not use physical discipline. In contrast, mother has historically used spanking as a form of discipline, and mother admitted to Sandvigen that she has slapped J in the face "occasionally." Mother also told Sandvigen that when she slapped J in the face it caused J to cry, but "not because it was painful, but because it hurt [J's] feelings." Father testified that mother had said that "she smacks [J] in the face and spanks her."

Mother, for her part, testified that the last time she "swatted" J in the face was two years before, *i.e.*, when J was a six year old; that the purpose of the "swat" was to get J's attention; that the "swat" was not hard enough to leave a mark; and that she has only twice "swatted" J in the face.

## E.  *J's Schooling and Education*

Mother and father take different approaches to J's education. Father thinks that it is important that children read every day, and when staying with father, J reads every

---

[3] After J alleged that Egle had hit her with a belt, J told her mother that she wanted to talk to a "counselor."

The trial court asked the following questions of mother during mother's testimony with regard J's request to see a counselor:

"THE COURT:  And when you said you—[J] had asked to see a counselor, you said you set her up with a counselor, you emailed [J's teacher] and you set her up with a counselor at school; is that right? As in like the school counselor; is that right?

"[MOTHER]:  Yes.

"THE COURT:  Did you ever seek out any mental health therapy for [J] when she requested it?

"[MOTHER]:  That was the only mental—just the school counseling.

"THE COURT:  Just the school counselor?

"[MOTHER]:  Uh-huh (affirmative).

"THE COURT:  How often did she see the school counselor?

"[MOTHER]:  To my recollection, maybe three times."

J's father had also voiced to J's mother that he wanted J to get counseling because of J "getting very angry and not knowing how to deal with her anger." J's mother thought that that was not necessary.

day. In contrast, at mother's home, there is no requirement that J read every day.

With regard to homework, J's first-grade teacher testified that she is "for" homework, and that when J was in first grade, she sent homework home, but that mother did not want J to do the homework, because of the time that it took and because mother was busy in the evenings.

The first-grade teacher also testified that, at father's home, father helps J with homework. The teacher testified that J cared about completing her homework, that completing homework was a "value" that J had, and that J wanted to do her homework.[4]

In second grade, mother allowed J to do homework, but did not encourage it. Mother explained that, if J takes out her homework and says "I love homework[,] let's do homework" that is okay with mother, but, other times, J does not mention homework and does not do it. Mother also explained that the school J attends for second grade—which is a different school than J attended in first grade—sent a note to parents at the beginning of the school year indicating that homework is optional.

---

[4] During the modification hearing, mother testified that after J started receiving homework in first grade, mother talked to mother's friends about that, and mother's friends were "surprised" that J's school or teacher was requiring homework at J's young age. Mother further testified that she found some articles on the internet that "kind of like validated my decision to just opt out of homework."

Additionally, during the modification hearing, J's first-grade teacher was asked whether there was "an arrangement that you and [mother] reached about what was appropriate under circumstances for [J's] homework?" J's first-grade teacher explained:

"I'm—you know, for homework, I'm—you know, when a parent says I don't want her to do the homework, I—as a teacher, I don't debate parents on that because that's eventually their choice if they're doing homework or not. So I agreed like if that's her policy, then I was fine with that. But the homework kept going home and [J] wanted to do it. But I think I was understanding of why she couldn't do it at night, so I allowed that to happen."

J's first-grade teacher also explained that the homework that she sent home consisted of a "math sheet," as well as a "reading log" that parents "have to sign." Mother testified that the reading logs "became a cumbersome like thing," so mother "talked to the teacher about it, and [the teacher] agreed that I wouldn't have to sign it."

Additionally, J's first-grade teacher testified that there was a difference in how well-rested J was when J arrived at school, depending on whether J was staying with J's mother or J's father; specifically, on days J was in mother's care, J was "tired" at times when she arrived for school.

With regard to school attendance, J was absent from school more often when she was in mother's care than in father's care. Mother at times kept J home from school because it was convenient for mother. Mother also took J out of school early when doing so suited mother's schedule.

Additionally, J's teacher testified that J was often late for school when in mother's care in first grade and that being late for school made J feel bad "because [J's] one to really care about how she performs in school."

Mother testified that she was unaware that J was frequently late for school when J was in first grade, because, for part of the time that J was in first grade, someone else took J to school for mother.

J performs well in school overall but gets anxious regarding some of her schoolwork.

F.   *Dental and Medical Care*

With regard to J's dental and medical care, father typically is the parent who arranges for J's dental care, and typically is the parent who takes J to the doctor.

As to dental care, in the summer of 2017, mother cancelled a dental appointment that father had scheduled for J. Mother told father's wife that mother had cancelled the appointment because mother had found a new dentist for J and was going to make another appointment for J. Mother, however, although she had been informed that J had cavities, did not schedule a dentist appointment for J after cancelling the appointment that father had made. Months later—after failing to schedule a dental appointment for J—mother told father that he could schedule a dental appointment for J.

Mother testified that she had not taken J to a "well-child checkup" since J was two years old, because such visits were not "mandatory or even encouraged" after two years of age.

## G.   *The Trial Court's Ruling*

After hearing evidence on father's motion to change custody, the trial court issued a ruling from the bench, noting its understanding that the "primary goal" of the change of circumstances rule is to ensure that children have "stable lives."[5]

The trial court found that it was "very, very apparent *** through testimony and from interacting [with J] directly" that J was "incurring a substantial amount of distress." The trial court also commented that it was "very worried" about J, that "my heart aches for this kid," and that it would require that J be "evaluated for her mental health concerns and complete any recommended treatment or aftercare." It further stated that, in its view, what some witnesses had characterized as J's "precociousness" actually "has a lot to do with parentification of a young child," as well as J's "need to be heard and to gain attention; good, bad, or otherwise."

The trial court expressly determined that the testimony of Sandvigen and J's first-grade teacher was credible, and gave Sandvigen's testimony "great weight," because of Sandvigen's "experience and training in forensic interviewing with a child, as well as her experience with Protective Services work." The trial court further noted that J's first-grade teacher and Sandvigen were the only two witness that the trial court considered "to have no bias or motive in testifying," in contrast to "parents, their family members, [and] their significant others" who "always have skin in the game." That is, unlike J's first-grade teacher and Sandvigen, the other witnesses "wanted[ed] to see a particular outcome." The trial court also questioned whether the witnesses mother called knew about mother's practice of "physical corporal discipline"—including slapping J in the face—and noted it was "not convinced" that the information mother's witnesses had was "completely accurate."

The trial court determined "that there has been a substantial unanticipated change in circumstances since the entry of the last custody judgment," specifically noting,

---

[5]  And thus, unlike the majority suggests, the trial court did not understand its role as being to "decide with which parent it agrees." 309 Or App at 687.

"[w]hen the last custody judgment was entered, [J] was, *** less than one ***. It's been at least eight years, and she's eight now, so it's been a very, very long time. ***

"So I find that over the period of time, while it may have been appropriate to have [mother] be the sole legal custodian of [J] when she was an infant, *** there have been significant changes in circumstances since that time to today's date based on all of the facts in the record at this time with respect to her becoming school age, her participation in school, behaviors in the home, concerns about behaviors in the home, people living in each of her homes, and of course, most recently, this disclosure about this alleged incident with a belt occurring with Mr. Egle. And that all relates to mother's capacity to remain as a custodial decision maker for the child, and so I find there has been a substantial change in circumstances ***."

The trial court further noted that, although J's allegation regarding Egle was closed as unfounded by the Department of Human Services, "the standard for DHS removal of a child, or even a safety plan or open assessment, is much higher than preponderance of evidence in a family law case," and explained that "many of the issues that are going to be dispositive in this case hover around each parent's dealing with" J's allegation that Egle had hit her with a belt.

The trial court then stated:

"I find that [J] made the disclosure [that Egle had hit her with a belt]. I think that's clear in the record that she did it. I'm not particularly convinced that it's clear in the record how it came about or why she did it. ***

"But there is significant evidence in the record to suggest that she did it, she did it for a reason. There was some upheaval in her home with [mother]. I am not an expert to evaluate why she might have felt the need to do this, to either get attention or be heard about something that's happening for this child.

"*****

"I have great concerns about what [Sandvigen] reported about [mother's] behavior in relation to the disclosure [that Egle had hit J with a belt]. *** I find that there is *** substantial evidence in the record to suggest that [mother's]

reaction to this disclosure was not to support and protect her child and figure out what's going on for her kiddo, it was to defend her fiancé, to call her child a liar repeatedly in this courtroom and out of it. And then proceed to call [J] as a witness to have [J] recant the story in this courtroom so that I should believe her when she is recanting, but I should believe that she's a liar in all other circumstances, I find very problematic."[6]

The court also noted that, although it was not convinced that J got hit with a belt, it was the fact that she said that she did, in and of itself, and "what flowed from that in terms of the parental behavior, coupled with everything else" that gave rise to its change of custody decision.

With regard to the factors provided in ORS 107.137(1) for determining the best interests of a minor child regarding custody, the trial court determined that, "based on the circumstances of this case and the facts deduced" during the custody modification hearing, father "is the person in a better position to make decisions for [J's] wellbeing academically, medically, and otherwise, so he's awarded custody."[7]

---

[6] The trial court was perhaps critical of mother's choice to call J as a witness, given that mother had previously characterized J as a liar. Our Supreme Court, too, has been critical of the practice of calling children as witnesses during divorce proceedings. *Kreutzer v. Kreutzer*, 226 Or 158, 162, 359 P2d 536 (1961) ("[W]e share the view of the circuit judge that in a case of this kind, young children of the parties should not be forced to become witnesses and, perhaps, to take sides in open court against one or the other of their parents. This practice has been frowned upon by other courts."); *id*. ("'The practice of calling children of the parties as witnesses in a divorce action has been repeatedly disapproved by this Court. Counsel, if possible, should refrain from doing so. It is bad from a social view point though not legally forbidden.'" (Quoting *Buck v. Buck*, 320 Mich 624, 628, 31 NW2d 829, 831 (1948).); *see also Gonyea*, 232 Or at 374 ("The tragic nature of divorce is vividly portrayed when young children are drawn into the proceedings as witnesses to take sides against one or the other of their parents, both of whom they should dearly love.").

[7] ORS 107.137(1) provides, in relevant part,

"in determining custody of a minor child *** the court shall give primary consideration to the best interests and welfare of the child. In determining the best interests and welfare of the child, the court shall consider the following relevant factors:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship;

"(d) The abuse of one parent by the other;

The trial court's determination regarding J's best interests turned "primarily" on its evaluation of ORS 107.137(1)(b), "the interest of the parties in and attitude toward the child," and the court weighed that factor in favor of father, finding that mother "puts a lot of things before [J]."

The trial court first discussed J's education, stating that, while many parents in child custody disputes raise concerns about "homework, attendance and tardies," and those concerns are "ticky-tack," that was not the case with respect to mother, father, and J.

About homework, the trial court found that mother had "disregarded the teacher's request" that J complete her math homework and reading logs, that J feels badly about not completing her homework, and that J not completing her homework was her mother's choice, not J's choice. The trial court found that it was not the case that J was "so awesome in everything [regarding school work] that she need not do follow-up and reinforcement work"—*i.e.*, homework—noting testimony reflecting that J "gets anxious around some of her schoolwork."

About J arriving late for school, the trial court found that mother took "no responsibility at all whatsoever for the tardies blaming it on everybody else." The trial court also found that, "even if" mother did not know that J was frequently late for school—which, as noted above, was mother's testimony—mother made "no effort[]" to discover that fact. The trial court viewed it as "incumbent upon a parent to require the information about their child getting to school, getting there on time, and doing well." In the trial court's view, mother did not undertake that effort. The trial court also found that the frequency with which J was late for school was not in J's best interests, because being late

"(e)  The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)  The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

"affects the child in the classroom in terms of getting in for the day, settling in for the day, becoming prepared, and feeling confident in their schoolwork moving forward."

About J's school attendance overall, the trial court found that mother's "choices around where [J's] time is best used is in [mother's] best interest," which "goes to the issue of parentification of [J]." The trial court noted that it inferred that if mother was "sick and keeping the child home," based on the facts in this case, "that's to help [mother] in the home when she is sick, because everybody else is relied on to get the child to school. If [mother's] sick, someone could still get [J] to school."

The trial court then turned to J's allegation about Egle. The trial court found that mother minimized that allegation, had repeatedly called J a liar, and "created a culture of silence and recantation from a child," which the trial described as "very concerning." The trial court also was concerned by J's testimony during the modification hearing denying that Egle had hit her because, as the trial court viewed it, J "parroted back verbatim two sentences" that the trial court heard from "adult testimony" concerning the incident—*i.e.*, that J heard people talking about getting spanked with a belt and she wanted to "join in." The trial court noted that that was consistent with Sandvigen's observations during her interview with J and mother—*i.e.*, that J's answers to questions regarding her allegation that Egle had hit her appeared "coached" or "scripted."

Additionally, the trial court found that mother minimized the fourth-degree assault charge for which Egle had pled guilty, which was concerning, as was mother's failure to take safety measures regarding Egle's prior domestic violence.[8]

---

[8] The trial court noted its concerns regarding mother's view of Egle's altercation with M and guilty plea as follows:

"You don't get to walk into [Domestic Violence Deferred Sentencing] and plead no contest. You're required to plead guilty. Yeah, I did that thing. I assaulted that person.

"Nevertheless, [mother's] testimony is that, no, he didn't do it. It's [M's] fault. [M] walked in, they had a fight, and it's all [M's] fault.

"I heard testimony from Mr. Egle that [M] was his girlfriend, and then he left [M] for [mother], then he left [mother] for [M], left [M], went back to

As to physical "discipline" by mother, the trial court found that mother's testimony during trial minimized "what she purportedly told Ms. Sandvigen about slapping [J] in the face as a form of discipline." The trial court noted that many children get "ruder and more disrespectful" as they get older, so if mother slapped J in the face when she was a six-year-old child, and J is "characterized by her mother as precocious and a liar, *** a natural inference and a reasonable inference" is that mother would likely slap J in the face again in the future. The trial court further noted that it had "great concerns about [mother's] choice for physical discipline" as she "admittedly on two separate occasions *** slapped [J] in the face when she was talking back rudely."

With respect to medical and dental care, the trial court noted that J not receiving well-child check-ups "goes to interest and attitude toward the child," and found that mother's failure to "allow" father to take J to the dentist after three cavities were identified was persuasive to the court with regard to the determination about who should have custody. It also noted that it thought J was "kind of an afterthought" to mother and is "not prioritized" by mother.

In making its determination regarding who should have custody of J, the trial court considered ORS 107.137 (1)(e), the "preference for the primary caregiver of the child." The court gave "preference to neither parent based on primary caregiver status," reasoning:

"I think that based on where [J] has been living, it could be construed that [mother] has been her primary caregiver in terms of a day-to-day feeding her and clothing her and getting her where she goes three weeks out of the month. But I find that in terms of the way the law defines primary caregiver status, I find that both parents are qualified primary caregivers under the circumstances of the case and

---

[mother], and now they're getting married. So clearly there is motive to come up with your own perspective and did not take any safety measures around those concerns. That's concerning to me."

The majority notes that "Egle maintained his innocence to mother, and mother believed his version of events over Egle's ex-girlfriend's." 309 Or App at 699. Mother also, apparently, believed Egle's "version of events" in which Egle was innocent over the version of events that Egle had admitted to when he pleaded guilty to fourth-degree assault in court.

I give preference to neither parent based on primary care-giver status."

Likewise, the trial court found that the other ORS 107.137(1) factors favored neither parent.[9]

## II.  ANALYSIS

A parent seeking to change custody must demonstrate two things:

"(1) After the original judgment or the last order affecting custody, circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed, and (2) considering the asserted change of circumstances in the context of all relevant evidence, it would be in the child's best interests to change custody from the legal custodian to the moving party."

---

[9] Before turning to my analysis of the issues on appeal, I pause to note that the majority characterizes the trial court's finding that J was "incurring a substantial amount of distress" as being merely a comment "in the context of telling the parties that J loved both of them, was worried about what was happening in the hearing, and wanted to be sure that both parents were okay," rather than a finding related to the trial court's change-of-circumstances determination. 309 Or App at 703 n 11. And further, in the majority's view, the record would not allow a "finding" that J was experiencing a "substantial amount of distress" from a change of circumstances. *Id.* The majority also speculates that the trial court had "no serious concern about J's *** emotional safety in mother's home." *Id.* at 703.

I disagree with the majority. To be sure, the trial court noted that J, when testifying, was concerned about what was transpiring in the courtroom. But the trial court's comments concerning J's distress were broader than that. As noted, the trial court stated that it was "very worried" about J more generally and stated "my heart aches for this kid"; it discussed the issues J was dealing with in terms of "parentification of a young child" and J's "need to be heard and gain attention[,] good[,] bad or otherwise"; it ordered that J be evaluated for J's mental health concerns; and it stated that it believed J was "kind of an afterthought" to mother and is "not prioritized" by mother. Additionally, as noted, the trial court gave "great weight" to Sandvigen's testimony given Sandvigen's "experience and training in forensic interviewing with a child, as well as her experience with Protective Services work." That testimony included Sandvigen's observations of J when J was in mother's home and father's home, and Sandvigen's worry for J's emotional safety when Sandvigen observed J in mother's home, which is a fact the majority appears to minimize. *Id.* at 703 n 11. Further, J had repeatedly alleged that Egle had hit her with a belt and alleged that Egle had threatened to hit her with a belt—allegations that, regardless of their veracity, could reasonably raise concerns regarding J's emotional health. Finally, father testified as to J "getting very angry and not knowing how to deal with her anger." In my view, the "any evidence" standard is satisfied as to J's distress.

*Botofan-Miller*, 365 Or at 520 (internal quotation marks and brackets omitted).

The rationale for requiring that a party seeking to change custody demonstrate that "circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed" is that,

> "unless the parent who seeks a change in custody establishes that the facts that formed the basis for the prior custody determination have changed materially by the time of the modification hearing, the prior adjudication is preclusive with respect to the issue of the best interests of the child under the extant facts."

*State ex rel Johnson v. Bail*, 325 Or 392, 398, 938 P2d 209 (1997); *see also id.* (noting that in *Merges v. Merges*, 94 Or 246, 253-54, 186 P 36 (1919), the court cited the statute making judgments conclusive and explained the "defendant cites many precedents to the effect that this decree, like all others of a court having competent jurisdiction of the persons and of the subject matter, is final and that it cannot be overturned or modified unless subsequent conditions justify such a change").

"The purposes served by the change-in-circumstances rule are to avoid repeated litigation over custody and to provide a stable environment for children." *Johnson*, 325 Or at 398 (internal quotation marks omitted). "The inquiry into whether there has been a change in circumstances since the time of the previous custody arrangement is a factual one that relates to the capability of one or both parents to care for the child." *Id.*

With regard to whether "circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed," the Supreme Court has observed that "the child custody statutes do not specify what the concept of a change of circumstances means." *Botofan-Miller*, 365 Or at 520 (internal quotation marks omitted). The Supreme Court, however, "has made clear that, to justify a change in custody, a change of circumstances must be 'material.'" *Id.* (quoting *Johnson*, 325 Or at 398). "A material change is one that is adverse to

[the] child's welfare." *Id.* "That is, a new development may be considered a legally sufficient change in circumstances only if it is shown that the change has 'injuriously affected the child' or affected the custodial parent's 'ability or inclination to care for the child in the best possible manner.'" *Id.* at 520-21 (quoting *Boldt and Boldt*, 344 Or 1, 9, 176 P3d 388 (2008)). "Normal developmental changes \*\*\* cannot, in themselves, provide the basis for a change in circumstances." *Dillard and Dillard*, 179 Or App 24, 32, 39 P3d 230, *rev den*, 334 Or 491 (2002).

As noted above, the Supreme Court has long made clear that "there is 'no constant or standard quantity of change that will qualify' as a sufficient basis for a custody modification; rather, 'the amount of change necessary to justify a modification of a decree varies with the facts of the individual case.'" *Botofan-Miller*, 365 Or at 521 (quoting *Gonyea*, 232 Or at 372).

"A child whose circumstances have changed is entitled, when a parent institutes a proper proceeding, to consideration of the child's best interests." *Johnson*, 325 Or at 399.

When analyzing whether it would be in a child's best interests to change custody from the legal custodian to the moving party, ORS 107.137(1) requires the court to consider the following factors:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."

In her first assignment of error, mother contends that the trial court erred in its custody determination, because father had not demonstrated a "substantial change of circumstances." In her second assignment of error, mother contends that, even if father had demonstrated a substantial change of circumstances, the trial court "erred in its assessment" of the statutory factors provided in ORS 107.137(1) for determining whether a change of custody from mother to father was in J's best interests. I consider each assignment in turn.

## A.   *The Trial Court's Change-of-Circumstances Determination*

In support of her contention that the trial court erred in its custody determination because father had not demonstrated a substantial change of circumstances, mother argues that many of the "changes" identified by the trial court—*viz.*, J "becoming school age, [J's] participation in school, behaviors in the home, concerns about behaviors in the home, people living in each of [J's] homes"—are "nothing more than changes that are related to the passage of time and [J's] maturing." In mother's view, those are not "changes to [mother's] 'capacity' to provide proper care," and if it were "otherwise, then the 'change of circumstances' rule would be a rule of limited duration, such that the passing of a few years' time would automatically trigger the possibility of reevaluating custody."

Mother also argues that the trial court's concerns regarding "the belt disclosure" are "overstated," because "we do not know why [J] made the disclosure." Therefore, mother is "unsure whether [the belt disclosure] is cause for great concern or little concern." Additionally, mother argues that mother's "failure to immediately believe [J's] false story and support her in telling the story" did not affect mother's "capacity to remain as a custodial decision maker."

I am not persuaded by mother's arguments, and I would conclude that evidence in the record supports the trial court's determination that circumstances relevant to the capacity of mother to take care of J properly had changed in a way that was adverse to J's welfare.

In this case, the last order affecting custody was entered June 2010, when J was still an infant. The custody modification hearing in this case occurred in January 2018, when J was an eight-year-old child. Evidence presented in the trial court and credited by the trial court reflects that a lot had happened during that time period. Based on the evidence before it, the trial court determined that, since June 2010, numerous circumstances had changed related to, among other things, "behaviors in the home, concerns about behaviors in the home, [and] people living in each of [J's] homes." I believe that that determination by the trial court is supported by evidence in the record.

More specifically, since the June 2010 custody order, Egle moved into mother and J's home, moved out of mother and J's home, then moved back into mother and J's home; Egle had previously pleaded guilty to a crime of domestic violence involving an allegation of strangulation; Egle on occasion got angry with J; J reported to a teacher that Egle had threatened to hit her with a belt; and J reported to various other individuals—including her father, her grandparents, Sandvigen, and a police officer—that Egle hit J with a belt.

Further, when J's allegation that Egle had hit her with a belt was investigated by Sandvigen, J presented as "scared" in mother's home and Sandvigen was "extremely concerned" for J's "emotional safety"; J gave "scripted" or "coached" answers to Sandvigen's questions; mother called J a liar and demanded that J tell Sandvigen that she had lied; and mother directed J regarding "what to talk about and what to say." In contrast, according to Sandvigen, J presented like a "typical seven-year-old" in father's home that was "[p]layful, relaxed, communicative, chatty, [and] friendly." As noted above, the trial court expressly credited Sandvigen's testimony, and, given Sandvigen's "experience and training in forensic interviewing with a child, as well as her experience with Protective Services work" gave that testimony "great weight." *See Botofan-Miller*, 365 Or at 524 (determining that this court erred when it "failed to grapple" with the custody evaluator's "foundational conclusion, which the modification court credited," that the "mother's anxious

attachment parenting style" was "harmful" to the child, and led to the child's late arrivals at school and missed counseling sessions).

Additionally, regardless of whether Egle actually did hit J with a belt, evidence in the record supports the trial court's finding that mother's response to J's allegation that Egle had done so was not to "support and protect her child and figure out what's going on for her kiddo," but instead to create a "culture of silence and recantation," "defend her fiancé," and "call her child a liar repeatedly." Indeed, as noted above, mother told the police "this didn't happen" before even discussing the allegation with J, notwithstanding Egle previously pleading guilty to an incident of domestic violence and having a restraining order against him.[10]

Moreover, evidence in the record reflects that mother's use of physical discipline in mother's home included slapping J in the face, conduct that the trial court, in the context of this case, with regard to the circumstances experienced by this child, expressed "great concerns" regarding; that mother minimized the fourth-degree assault charge to which Egle had pled guilty, viewing him as innocent and the victim of the assault as not "truly a victim," notwithstanding

---

[10] The majority faults the trial court for describing mother as having created a "culture of silence and recantation" in response to J's allegation that Egle had hit her with a belt. 309 Or App at 702. The majority posits that, contrary to the trial court's description, "the only evidence is that mother insisted that J talk, not be silent, and wanted J to recant a lie, not the truth." *Id.*

In my view, evidence supports the trial court's characterization of the "culture" created by mother in response to J's allegation that Egle had hit J with a belt: (1) Sandvigen—who, as noted, the trial court expressly credited—testified that J's answers to Sandvigen's questions appeared "coached" or "scripted," that J's answers were not consistent with those of a seven-year-old, that mother directed J about "what to talk about and what to say" when Sandvigen was talking to J, and that mother called J a liar and demanded that J tell Sandvigen that J had lied; (2) the trial court observed that J, during her testimony, "parroted back verbatim two sentences that [the trial court] heard from adult testimony," which was "consistent" with Sandvigen's "experience with [J]"; (3) as noted, mother's immediate reaction upon learning about J's allegation that Egle (who had a history of domestic violence) had hit J with a belt was to tell a police officer and Sandvigen "this didn't happen"; and (4) mother had previously chosen to believe Egle's denial that he had engaged in conduct constituting domestic violence over the victim of such violence and over Egle's own admission in court that he had engaged in such violence.

Egle's guilty plea; and that mother failed to take "safety measures" regarding Egle's prior domestic violence.[11]

That evidence supports the trial court's finding that J was "incurring a substantial amount of distress" in mother's home.

As should be evident from the foregoing, the change of circumstances regarding, as the trial court phrased it, "behaviors in the home, concerns about behaviors in the home, [and] people living in each of [J's] homes," are not merely "related to the passage of time and [J's] maturing," as mother contends. That is, Egle's entry into J's home life and mother's approach to J's well-being resulted in upheaval, concerns for J's emotional safety, and a substantial amount of distress. Those are not normal developmental changes. To the contrary, those circumstances evince a material change that constitutes a deterioration in mother's overall ability to parent J that occurred after the June 2010 custody order, supporting the trial court's determination that a change of circumstances had occurred.

Mother's decisions and parenting choices concerning J's schooling also provide support the trial court's determination that mother's capacity to take care of J properly

---

[11] About physical discipline, the majority observes that "there was no evidence that mother had ever used unlawful physical discipline or injured J in any way," that father "failed to prove" that Egle was "abusive," and that "reasonable parents can disagree about the occasional use of physical discipline." 309 Or App at 698.

That is all well and good, but it is also only minimally relevant given the trial court's ruling. This is not a dependency case, and the question on appeal is not whether J was the victim of abuse or whether it is illegal to physically discipline children in Oregon.

As noted in *Botofan-Miller*, and as explained in this dissent, the trial court was to consider whether:

"(1) After the original judgment or the last order affecting custody, circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed, and (2) considering the asserted change of circumstances in the context of all relevant evidence, it would be in the child's best interests to change custody from the legal custodian to the moving party."

365 Or at 520 (internal quotation marks and brackets omitted). In my view, it properly did so in making its ruling, and, given the evidence, it permissibly considered the type of physical "discipline" used by mother and mother's minimization of what she disclosed to Sandvigen regarding that physical "discipline."

had changed, and had changed in a way that was adverse to J's welfare. The trial court determined that, since the June 2010 custody order, circumstances had changed related to J becoming "school age" and J's "participation in school." We understand the trial court's reference to changes related to J becoming "school age" and J's "participation in school" to refer to mother's approach to J's education now that J is of school age.

Since the June 2010 custody order, J became old enough to attend school and, as detailed above, mother did not ensure on a regular basis that J attended school on time, well-rested, and having completed her homework, and J missed school when doing so was convenient for mother. That J did not complete her homework when staying with mother was not J's choice; it was mother's choice. Mother's "choices around where [J's] time is best used is in [mother's] best interest," as opposed to J's, which the trial court found to be problematic, as it "goes to the issue of parentification of [J]."

Although the trial court observed that, in some cases, a parent's complaints about the other parent with regard to "homework, attendance and tardies" are "ticky-tack," the trial court expressly found that not to be the case here. The trial court's finding on that point is supported by evidence in the record: As discussed, the trial court credited the testimony of J's first-grade teacher, which included that teacher's assessment that mother's approach to J's education made J feel bad because J "really care[s] about how she performs in school" and completing homework was a "value" that J had. And although J typically performed well in school, the record supports the trial court's finding that J was anxious about her school work and that it was not the case that J was "so awesome in everything that she need not do follow-up and reinforcement work," which required the attention of mother. *Botofan-Miller*, 365 Or at 505 ("[W]e will uphold the trial court's findings of facts if there is any evidence in the record to support them.").

On its own, mother's approach to J's education might not be of such a nature or magnitude as to support a change of circumstances sufficient to justify a change of custody.

*See Colson and Peil*, 183 Or App 12, 23-24, 51 P3d 607 (2002) (noting although son's "poor school attendance poses a concern, it is not of such a nature or magnitude as to constitute a change of circumstances sufficient to justify a change of custody," where, among other facts, son was "distraught over the dissolution of his parents' marriage," and mother "acted compassionately, if indulgently, in allowing" son's numerous absences). In this case, however, mother's approach to J's education was part of a course of conduct of mother putting "a lot of things" before J, and that course of conduct has had a discernable adverse effect upon J. As noted above, the trial court found that J was "incurring a substantial amount of distress." *See Buxton v. Storm*, 236 Or App 578, 592, 238 P3d 30 (2010), *rev den*, 349 Or 654 (2011) ("Where the claimed change of circumstances involves events of inadequate care and supervision, they must be of such a nature or number reflecting a course of conduct or pattern that has had or threatens to have a discernible adverse effect upon the child." (Internal quotation marks and brackets omitted.)).

In sum, I would conclude that evidence in the record supports the trial court's determination that circumstances relevant to the capacity of mother to take care of J properly had changed in a way that was adverse to J's welfare. Although I do not believe that any one fact found by the trial court would necessarily reflect a material change constituting a deterioration in mother's overall ability to parent J, and would not make a determination that a child's distress related to school, standing alone, would necessarily reflect a change that is adverse to a child's welfare, in this case, in light of our standard of review as set forth in *Botofan-Miller* and the express credibility determinations made by the trial court, I believe that we are required to affirm the trial court's change-of-circumstances determination.

B.   *The Trial Court's Best-Interests Determination*

As noted above, in her second assignment of error, mother contends that, even if father had demonstrated a substantial change of circumstances, the trial court "erred in its assessment" of the statutory factors provided in ORS 107.137(1) for determining whether a change of custody from mother to father was in J's best interests. Specifically,

mother argues that "the trial court failed to properly consider the 'preference' that is given to the child's 'primary caregiver.'"

As indicated above, in this case, the trial court gave "preference to neither parent based on primary caregiver status," reasoning:

"I think that based on where [J] has been living, it could be construed that [mother] has been her primary caregiver in terms of a day-to-day feeding her and clothing her and getting her where she goes three weeks out of the month. But I find that in terms of the way the law defines primary caregiver status, I find that both parents are qualified primary caregivers under the circumstances of the case and I give preference to neither parent based on primary caregiver status."

In mother's view, that determination was erroneous, because

"[J] spent nearly all of her time with mother in her first three years of life; subsequently, and until the time of trial, [J] spent the first week of each month with father and the balance of the school year with mother. No matter how one looks at the evidence, it is mother who, for the entirety of [J]'s life, has provided her with the majority of her care and her interactions with a parent."

We have previously observed, "generally, the primary caregiver is the party who has provided more care for the child and with whom the child has lived a majority of his or her recent life." *Gomez and Gomez*, 261 Or App 636, 638, 323 P3d 537 (2014) (brackets and internal quotation marks omitted). In *Nice v. Townley*, 248 Or App 616, 274 P3d 227 (2012), we explained:

"Which party is the primary caregiver may be determined by considering which party has nurtured the child and has taken care of the child's basic needs, for example by feeding the child, nursing the child when he or she is sick, scheduling daycare and doctor's appointments, and spending time disciplining, counseling, and interacting with the child."

*Id.* at 622.

Here, I would conclude the trial court did not abuse its discretion when it did not weigh the preference given to the child's primary caregiver in mother's favor. Evidence in the record allowed the trial court to determine that it was father who primarily "nurtured" J and took care of J's "basic needs." The trial court's findings reflect that it viewed father as more encouraging than mother with respect to J's education, *i.e.*, ensuring she arrived at school on time, well rested, having completed her homework, and requiring that J read daily when she was staying with him. In contrast, the trial court found that mother disregarded J's teacher's request that homework and reading logs be completed and failed to take any responsibility for J's tardies. Additionally, father was the parent who primarily provided for J's dental and medical care, whereas the trial court found J was "kind of an afterthought" and "not prioritized" by mother. Indeed, the trial court specifically noted and found "persuasive" the instance where mother did not "allow" J to be "taken to the dentist" after it was discovered that J had three cavities in her permanent teeth, concluding that that was not in J's "best interest." Moreover, the trial court expressed "great concerns" regarding about mother's "choice for physical discipline" given that she had "admittedly on two separate occasions *** slapped [J] in the face when she was talking back rudely." Further, we observe that, although J spent more time with mother than father, throughout much of her life, J spent a significant amount of time with father as well.[12]

---

[12] I note that mother did not preserve an argument that, as a legal matter, under ORS 107.137(1)(e), a child can only have one "primary caregiver." Mother's argument that she was the "primary caregiver" was not sufficient to present that legal issue to the trial court. *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."); *see also State v. Martinez*, 275 Or App 451, 459, 364 P3d 743 (2015), *rev den*, 358 Or 611 (2016) ("Ultimately, the focus of our preservation inquiry is on whether a party has given opponents and the trial court enough information to be able to understand the contention and to fairly respond to it.").

In *Kirkpatrick and Kirkpatrick*, 248 Or App 539, 550-54, 273 P3d 361 (2012), we declined to address the mother's unpreserved argument that the trial court erred when it determined that "both parents had served in the role of primary caregiver throughout the[] children's lives at different times" because, (1) "had mother objected to the trial court's assertion that father had been the children's primary caregiver ***, the court would have had an opportunity to explain what

### III. CONCLUSION

In sum, I would conclude that the trial court did not err when it determined that circumstances relevant to the capacity of mother to take care of J properly had changed in a way that was adverse to J's welfare. I would also conclude the trial court did not abuse its discretion when it determined that it would be in J's best interests to change custody from mother to father.

In light of the foregoing, I respectfully dissent.

Egan, C. J., Armstrong, DeVore, and Shorr, JJ., join in this dissent.

---

it meant by that statement, which could have obviated the need for this court to address the issue on appeal" and (2) the "primary-caregiver factor did not weigh heavily in the trial court's analysis of the best interests of the children."

The same is true here. Had mother objected to the trial court's assertion that "both parents are qualified primary caregivers under the circumstances of the case" the trial court would have had an opportunity to explain what it meant by that statement, which could have obviated the need for this court to address the issue. Further, it is evident that the trial court's primary-caregiver determination did not weigh heavily in the trial court's analysis. Instead, the trial court's determination regarding J's best interests turned "primarily" on ORS 107.137(1)(b)—*i.e.*, the "interest of the parties in and attitude toward the child." Accordingly, if this were the majority opinion, with regard to mother's second assignment of error, I would not exercise discretion to address whether the trial court erred in determining that, for purposes of ORS 107.137(1)(e), both parents were "qualified primary caregivers."